**THE KINETIC. THE PHILIP J. KENNY. THE KENCORS. TICE TOWING LINE v. NEW YORK TOWING & TRANSPORTATION CORPORATION et al.**

No. 4072.

Circuit Court of Appeals,. Third Circuit.

March 27, 1930.

Park Mattison & Lynch and Anthony V. Lynch, Jr., all of New York City, for appellant.

Macklin, Brown, Lenahan & Speer, and Single & Single, all of New York City (Horace L. Cheyney, J. Dudley Eggleston, and Carroll Single, all of New York City, and Wilmer H. Eberly, of San Francisco, Cal., of counsel), for appellees.

Before WOOLLEY and DAVIS, Circuit Judges, and JOHNSON, District Judge.

WOOLLEY, Circuit Judge.

This case arose out of a collision in Newark Bay between scows in tow of the Steam Tug "Kinetic" and; the lighter "Kencors" in tow of the Steam Tug "Philip J. Kenny," causing damage to the lighter and loss of her cargo owned by the Ford Motors Company.

The corporate owner of each tug filed a petition in the District Court to limit its liability to the value of its tug at the time of the collision and each owner, charging the tug of the other with the sole fault, claimed exoneration from all liability. The cases were consolidated and tried together. At the trial, after concessions that liability of the towing companies should be limited to their respective tugs, the only questions were those of fault and liability of the vessels. The court, finding them mutually at fault, entered interlocutory decrees in both cases. Only the owner of the Kinetic appealed. The owner of the Kenny, though here as appellee, argued the case de novo, claiming broadly the exoneration from liability which it had asserted in its petition.

The story of the collision as told by the major facts admitted and the minor facts found by us, where in a few instances they were disputed, is briefly as follows:

The Kinetic, a low-powered tug, was bound up the Newark Bay channel with two scows laden with sand in a tandem tow on short hawsers. The Kenny, a high-powered tug, was bound down with two unladen light-

ers and one lighter (Kencors) laden with automobile materials, also in a tandem tow on short hawsers.

It was night. Visibility was good. There was an easterly wind of about fifteen miles an hour. The tide was setting in. The channel at the point of collision was about 450 feet wide. These were the nautical conditions.

The Kinetic, upward bound, was in midchannel; the Kenny, downward bound, was on the left side—her own port side—of the channel. Each tug sighted the other when something less than a half mile apart, the Kenny for an instant showing her red light, and thereafter each steadily showing her green light to the other. For a time, and without doing anything, each tug kept in view the running lights of the other tug. When, according to the testimony, they had approached to within 300 to 600 feet of each other (though the distance may have been somewhat greater), the Kinetic sounded two short blasts of her whistle indicating her intention to pass starboard to starboard. The Kenny heard the signal, but made no response. Nor did she give a signal of her own. Having heard the signal, we shall assume that she silently assented to it. At all events, the Kenny's silence did not disturb the Kinetic or affect her subsequent movements. In signaling for a starboard to starboard passing and in silently assenting to the signal, the two tugs departed from the main purpose of the Narrow Channel Rule (Art. 25 of the Inland Rules [33 USCA § 210]), which provides that:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

This rule has frequently been construed, not as a hard and fast command for a port to port passing in every situation, but as distinctly requiring such a passing unless it be not "safe and practicable."

Was the situation in this instance such as to bring the vessels within the exception to the rule?

We think the situation at the time they sighted each other was such as safely and practicably to permit a port to port passing. But as the vessels approached each other, the distance between them shortened, and the situation changed every second until finally when the Kinetic gave the starboard to starboard passing signal it is very doubtful that a port to port passing was safe and practicable.

The positions of the tugs as they were then may have justified a starboard to starboard passing. But in that event, the two vessels, having failed to keep to their proper sides of the channel and to signal for a port to port passing when such courses and such a passing were safe and practicable and having proceeded on improper courses so closely toward each other as to make a port to port passing unsafe or impracticable and hence to compel a starboard to starboard passing, and in this way having departed from the spirit of the rule, assumed the extra burden which the departure placed upon them, namely: To navigate their tows in a way to assure a safe passing.

What should they have done? On the signal the Kenny should have put her wheel to starboard and eased off to her port. The Kinetic should have put her wheel to starboard and moved to a position farther to her port. If the two tugs had performed these simple and customary maneuvers they would have widened the space between them at the point of passing and thereby have reduced the risk of collision.

What did the Kinetic do? That tug in mid-channel, after giving the starboard to starboard passing signal, put her wheel "four spokes" to starboard. If there had been sufficient distance to go, this small change of the wheel might eventually have put her and her tow away from mid-channel and well to her port side of the channel. But in the short distance she had to cover before passing the Kenny the change put the bow of the tug only "on kind of a slant, not anything too much." In other words, the Kinetic's four-spoke movement of her wheel to starboard, in view of her low power and heavy tow, the relation of the two tugs in respect to the fairway of the channel and in respect to their distance apart, was more of a gesture than a maneuver for, manifestly, it did not put her well on the port side of the channel. It moved her, if at all, only a little way from her original position in mid-channel.

What did the Kenny do? The Kenny on her own port side of the channel held her course in sullen silence straight down that side, yielding nothing.

The captains of the two tugs, conscious of their trailing tows, must have seen while yet well apart that the passing would be close. As it turned out the tugs passed only 40 or 50 feet apart. Although the Kenny had plenty of channel water to her port (150 feet or more) and the Kinetic had ample water to her port (200 feet or more) in which to

draw off, they did nothing to avoid a uselessly close passing. The tugs passed safely but for some reason, with which, because of what already had transpired, we are not concerned, the two scows in the Kinetic's tow came into glancing contact with the lighter Kencors, the last lighter in the Kenny's tow, causing her to dump her cargo and sink.

From these facts it is clear that the Kinetic by her starboard to starboard passing signal created a risk of collision and thereafter made merely a feeble and wholly ineffectual move to avoid or minimize the risk. The Kenny, by silently assenting to the signal, recognized the risk and did nothing to avoid or minimize it. The responsibility for safe and seamanlike maneuvers following the giving and accepting of the signal was mutual. Failure of the tugs to meet their responsibility makes the fault mutual also. Had either craft maneuvered properly the collision would not have happened. As neither did so, each is liable for its own fault.

The decree is affirmed.

## COOPER v. GILBERT et al.
### No. 193.

Circuit Court of Appeals, Tenth Circuit.
April 21, 1930.

Eugene Jordan, of Tulsa, Okl., for appellant.

Conrad E. Cooper, of Tulsa, Okl., for appellees.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

COTTERAL, Circuit Judge.

This is an appeal by the defendant, Cooper, from an adverse judgment in favor of the receivers of the Turman Oil Company upon a promissory note for $2,900, with interest and costs.

The petition of the receivers sets out their appointment and authority, and alleges the note was executed by Miller & Stuart to Cooper and indorsed by him, and the oil company became the owner of it before maturity.

