**WOODRUFF et al. v. DELAWARE, L. & W. R. CO.**

**No. 322.**

Circuit Court of Appeals, Second Circuit.

July 20, 1942.

Henry C. Eidenbach and Hagen & Eidenbach, all of New York City, for appellants.

Austin J. McMahon and John E. Morrissey, both of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from a decree in the admiralty, holding the ferryboat, Meadville, solely liable for a collision between herself and the claimant's ferryboat, Scranton, in the North River on July 14, 1940 about 1,000 feet off Pier 25 on the Manhattan side, in broad daylight and clear weather. The contact was between the port bow of the Meadville and the starboard side of the Scranton about amidships. The Meadville's Manhattan slip is between Piers 19 and 20, and her regular trip is to the Erie slip just below Pier 4, Jersey City, and the distance between the pier ends is about 4500 feet. The Scranton's Manhattan slip is between Piers 15 and 16; her trip is to the Lackawanna ferry pier at Hoboken, and the distance between pier ends is about 7500 feet. The average running time of the Meadville was between six and seven minutes, that of the Scranton nine to ten minutes; hence the average speed of the Scranton was a little less than 800 feet per minute and that of the Meadville a little less than 700 feet. The judge found that on the day in question the ferries "were each running on their usual running time" but that the Meadville "was proceeding at a higher rate of speed than the Scranton." Since there is no other evidence as to the speed of each than that which we have just given, these findings are obviously inconsistent. (The master of each vessel testified that he checked his watch before leaving and that each left at 3:31. There is, however, a margin in each case of half a minute since the time is logged only to the nearest minute; hence it is possible that each left at any time between 3:30½ and 3:31½, and that there might have been nearly a minute's interval between their clearing. Therefore, any argument based upon the assumption that they left at the same time must be repudiated.)

The Scranton's master said that when he was abreast of Pier 19, the Meadville was coming out of her slip and that she then bore two or three points on his starboard bow; the wheelsman said that the Meadville was on his starboard bow but he did not know how many points. The master said that the Meadville "was just approaching the mouth of the slip"; the wheelsman that her stern "was just clearing the center pin"; we will assume that the master was right as to the Meadville's position, that being more favorable to the Scranton. The Meadville's master swore that he saw the Scranton about 100 feet off Pier 16 when he

was "about three-quarters of the way out of the slip"; and, although it is unlikely that the Scranton was then so far away, what he said confirms our choice of the testimony of the Scranton's master rather than of her wheelsman. The judge found that the Meadville overhauled the Scranton and was solely at fault, as she was the overtaking vessel. He was led to this conclusion very largely by the testimony of a passenger on board the Scranton, which we shall discuss later. We are forced to hold that this finding is "clearly erroneous"; in which event we may review it. Petterson Lighterage & Towing Corp. v. New York Central R. R., 2ᵈ Cir., 126 F.2d 992.

■ ■ We start with the undisputable fact that the Scranton was originally the burdened vessel, having the Meadville on her starboard hand; and so she remained unless at some time thereafter the Meadville got two points abaft her beam (§ 209, Title 33 U.S.C.A.) and then overhauled her. Since we can plot the courses of the vessels with very substantial certainty and know the place of collision, we are in a position to compute their positions from time to time with greater certainty than is usually possible. Let us assume that the Meadville was two, not three, points on the Scranton's bow when she was "just approaching the mouth of the slip," i. e. when her bow was close to the end of Pier 20. If so, the Scranton was then about 1650 feet from collision and about 500 feet off Pier 19. Since the end of Pier 20 is about 1500 feet from the place of collision, the Meadville's average speed could not therefore have been more than 90% of the Scranton's. If the Scranton ever got her two points abaft her beam, the Meadville must have been going more slowly for a time and then picked up speed and overtaken her. It is indeed reasonable to assume that she may not have had full speed when she left her slip; but it is impossible to attribute to her the necessary variation in her speed. The end of Pier 20 was itself two points abaft the Scranton's beam when she was about 1350 feet from collision. If we assume that the Meadville was at the end of that pier when the Scranton had her two points on the Scranton's starboard bow, the Meadville must have moved some distance on her course while the Scranton was moving the 300 feet to a point where the end of Pier 20 was two points abaft the Scranton's beam. Therefore, the Scranton was still the burdened vessel when she was 1350 feet from col-

lision. It is of course impossible to know how fast the Meadville was moving while the Scranton was covering those 300 feet. If we say that she was moving at only half the Scranton's speed—a highly unlikely assumption—she was still forward of the Scranton's beam. We must therefore assume that the Scranton continued to draw ahead until she had the Meadville two points abaft her beam before the Meadville got her full way, and that thereafter the Meadville gathered enough more speed to overhaul the Scranton in the remaining distance. That is impossible. Even if the Meadville had stood still from the moment when the Scranton had the end of Pier 20 two points abaft her beam until she had the Meadville two points abaft her beam, the Scranton would have been less than 1200 feet from collision, and the Meadville about 1350. But again, the Meadville was not standing still, and the distance is still further reduced between collision and the point at which the Scranton became the privileged vessel. At no such distance could the Meadville have overhauled her; nor could the variations in the Meadville's course have very perceptibly changed these computations.

The testimony of the passenger is not to the contrary. This was the substance of it. When passing the Meadville's slip he noticed that she was leaving it, though not yet in the river. He paid no "more attention to the boat at that time," or until another passenger came down the stairs with a child who said, "Look, Dad." Then the witness turned and saw the Meadville "a little in back of us, but alongside of us * * *. Then it seemed as if the Erie ferry was coming in a diagonal position towards the Scranton." This is a perfect description of what a person, especially a landsman, would see if the Scranton had overhauled the Meadville, crowding in upon her course and seeking to make her yield her privilege. It seems to us plain that this is what happened and for that reason we hold the Scranton at fault.

The Meadville was also at fault because, instead of holding her course as the rule required, she twice put her rudder right and ran for 300 or 400 feet "parallel," as her master put it. The Scranton was perhaps encouraged by this in her ruthless navigation; for if the Meadville had not yielded perhaps she would have done her duty. Nevertheless, for several reasons we will not hold that this fault contributed to the

collision. Neither in the Scranton's answer, nor in her argument or brief has she suggested this fault as an alternative to the fault of overtaking. Moreover, the case seems to us a proper one in which to apply the doctrine of The Victory & The Plymothian, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519, that when one vessel is guilty of glaring fault, we will not too jealously scrutinize the navigation of the other. The position of the master of a privileged vessel, faced with the approach of the burdened vessel which continues to crowd in upon him, is one of the most trying in which he can be placed. He will be condemned if he yields too soon, and he will be condemned if he does not yield soon enough; he may not act until the situation has got so bad that the burdened vessel cannot alone save it, and then he must. The Nordpol, 2 Cir., 84 F.2d 3. It is impossible to be sure when that moment arrives and meanwhile he must keep on in ignorance of the burdened vessel's purpose. Finally, in the case at bar there is the added reason that the Meadville's right rudder could not have contributed to the collision in any other way than by encouraging the Scranton to press on in her utterly unjustifiable course.

Decree reversed; and Scranton held solely liable.