THE MAMEI.

THE MONTROSE.

THE CASPIAN.

MARTUG TOWING CO. v. EASTERN TRANSP. CO.

Nos. 8876, 8877.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 19, 1945.

Decided Dec. 28, 1945.

Christopher E. Heckman, of New York City (Foley & Martin, of New York City, and Krusen, Evans & Shaw and T. E. Byrne, Jr., all of Philadelphia, Pa., on the brief), for Eastern Transp. Co.

Joseph W. Henderson, of Philadelphia, Pa. (Rawle & Henderson and Harrison G. Kildare, all of Philadelphia, Pa., on the brief), for the tug Caspian.

Howard M. Long, of Philadelphia, Pa. (Howard T. Long, of Philadelphia, Pa., on the brief), for Walling.

Before BIGGS, McLAUGHLIN, and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

This an an appeal from a District Court decree in the Admiralty which placed sole responsibility for collisional damages to the barge "Mamei" upon the tug "Montrose" and her owner, Eastern Transportation Company. The same decree held free from any liability for the collision the tug "Caspian" and her owner, Martug Towing Company.

The locus in quo is the Chesapeake and Delaware Canal, at a point just east of Guthrie's Run Spillway. There is a slight bend in the canal to the right at the point where the collision occurred. The width of the channel there is about two hundred and fifty feet.

On the night of May 5, 1943, "Mamei," a "dumb barge" (without motive power) was being towed by two tugs eastward through the canal. The tug "Caspian" was on her port quarter. "Hudson" was on her starboard quarter. This towing arrangement resulted in putting about 265 feet of "Mamei's" overall length of 355 feet forward of the two tugs. Evidently because "Mamei" was heavily laden with 6500 tons of coal, both tugs were required. In command of the so-called "Mamei" flotilla was Captain Middleton of "Caspian" who, stationed on the bridge of "Mamei", issued

orders to "Caspian" and "Hudson" as the three vessels proceeded eastward. With him on the bridge was Captain Paulsen of "Mamei." In the wheelhouse was the "Mamei" helmsman.

Tide was nearly high, current flowing eastward with "Mamei" and against "Montrose" at about one mile per hour. It was a clear night. Visibility was very good.

Proceeding westward was the tug "Montrose," in command of Captain White, and without tow. At approximately 11:10 p. m., just east of Guthrie's Run Spillway, "Montrose" collided with "Mamei," at a forty-five degree angle. "Montrose's" stem crashed into "Mamei's" port bow at the anchor, just under the port bow light. The facts thus far are undisputed.

██ We have reviewed the record de novo[1] as required, Brooklyn Eastern Terminal v. United States, 1932, 287 U.S. 170, 53 S.Ct. 103, 77 L.Ed. 240; The Denny, 3 Cir., 1942, 127 F.2d 404, bearing in mind that fact findings of the District Court, when supported by competent evidence, are entitled to great weight and should not be set aside except under a showing that they are clearly wrong: The S. C. L. No. 9, 3 Cir., 1940, 114 F.2d 964, 966, where Judge Jones remarked, "This rule appropriately recognizes that the trial judge has a peculiar opportunity for appraising the worth of oral testimony by observing the witness' demeanor which the cold print of a record fails to disclose."[2]

The question we have to decide is whether "Montrose" should alone suffer for the damages caused to "Mamei" or whether "Caspian" and "Mamei" ought to contribute under the "major and minor" fault doctrine of divided responsibility: The Schooner Catharine v. Dickinson, 1854, 58 U.S. 170, 15 L.Ed. 233; Atlantic Refining Co. v. Moller, 1943, 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168.

That "Montrose" was free from fault can hardly be contended. As we view the circumstances leading to the collision, "Montrose" was improperly navigated in many respects.

As "Montrose" proceeded westward, leaving Reedy Point at the eastern end of the canal, Captain White heard, via radio message sent out by the canal dispatcher, the word that the "Mamei" flotilla was in the canal proceeding eastward. "Montrose" did not continuously remain on her own starboard side of the narrow channel of the Chesapeake and Delaware Canal. Immediately prior to the impact she made an abrupt change of course to port. Under Art. 25 of the Inland Rules[3] this was a serious breach of navigational duty, particularly so since Captain White was put on notice that the "Mamei" flotilla was in the canal proceeding eastward and was familiar with the character, type and dimensions of the "Mamei."

██ Moreover, "Montrose," proceeding against the current and free of tow, was bound to yield to the "Mamei" flotilla the right of way under Regulation 11 prescribed by the Secretary of War for the Administration and Navigation of the Chesapeake and Delaware Canal.[4] See also The Edward Chilton, D.C.W.D.N.Y. 1928, 27 F.2d 624, 625. Under no view of the facts is it possible to conclude that "Montrose" yielded to "Mamei" and her tugs the right of way.

Prior to reaching the slight bend in the canal and at a point just west of Guthrie's Run Spillway, Captain Middleton, from the bridge of "Mamei," sighted "Montrose's" port running light and single white all horizon light. He estimated "Montrose"

[1] It is noted that counsel have failed to comply with our Rule 26 governing the printing of pertinent excerpts of the record. So many references in the briefs are made to matters dehors the Appendix that frequent reference to the original transcript of testimony was made necessary. Such a violation of the Rules is particularly to be condemned in the Admiralty where we are supposed to hear the case de novo.

[2] Five key witnesses testified at the hearing before the learned trial judge. Testimony of three witnesses was taken by deposition.

[3] This rule, 33 U.S.C.A. § 210, provides, "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

[4] Pursuant to Sec. 7 of the River and Harbors Act of August 8, 1917, 33 U.S. C.A. § 1, certain Rules and Regulations governing the navigation of this canal were prescribed. Regulation 11 provides, "All vessels proceeding with the current shall have the right of way over those proceeding against the current. • • •"

as being approximately a half mile away. This indicated that an unburdened vessel to the east of the slight bend was on "Mamei's" port. Captain Middleton ordered "Caspian" to blow a signal of one blast, indicating an intention to make a port to port passing. "Montrose" never answered this signal or made any other passing signals of her own which was a violation of Art. 18, Rule I, of the Inland Rules.[5]

Captain Middleton testified that, at that point, there was no action on the part of the "Montrose" to cast doubt on her course or intentions, and he proceeded eastward without answer to his one blast signal. He ordered a right rudder, bringing "Hudson's" starboard side close to the south bank of the canal. When the vessels were from eight hundred to nine hundred feet apart, they were making the bend. Captain Middleton observed the "Montrose" crossing "Mamei's" bow, taking her to the port side of the flotilla. When the approaching vessels were about two hundred to two hundred fifty feet away, "Montrose" suddenly showed both her running lights, indicating that "Montrose" was changing her direction to port. Captain Middleton ordered "Caspian's" engines in reverse and the sounding of a four-blast danger signal, which was given. "Montrose" now showed only her green light, indicating an abrupt change of her course further to port, and the "Caspian's" general alarm sounded, followed in less than a minute by the collision.

Captain White's version of the circumstances is as follows: He testified that he first saw the lights of what turned out to be the "Mamei" flotilla when the vessels were from "500 to 1000" feet apart. He saw two sets of lights, one slightly on his starboard bow, on the north side of the canal, "close to the north bank," which consisted of two vertical white (towing) lights. These indicated to him a burdened vessel towing another in the same direction as "Montrose". He saw at the same time, approximately one hundred twenty-five feet south of these two white towing lights and near the south bank of the canal, the red and green running lights of another vessel. This indicated to him that the vessel near the south bank of the canal was approaching him. He thereupon concluded that there were two vessels ahead of him (at least one of which was burdened with a tow) proceeding in opposite directions. The one near the south bank was approaching him, whereas the one on the north bank was proceeding westward, as he was. He then noticed the two white lights "coming closer to me," whereupon he concluded that both vessels were approaching him. Nevertheless, he decided to make a passing in between what appeared to be two separate vessels approaching and at least one of which he knew had a tow. Despite his doubt and shifting conclusions at this point, Captain White gave no signals whatsoever. He merely proceeded "cautiously" to make this narrow passing.

Thus, even according to his own version, at this point Captain White was seriously at fault. If the two sets of lights confused him, he was bound to signify his doubt by giving at least four short and rapid whistle blasts, under Art. 18, Rule III, of the Inland Rules.[6] And if he was not in doubt, he was still required under the Nautical Rules of the Road to make some sort of passing signal. And, in any case, he was attempting a maneuver which in a channel as narrow as this would have been extremely unsafe and dangerous navigation.[7]

It may very well have been these errors in estimating the situation which led Captain White to the ultimate collision. According to his testimony, when "Montrose" was but seventy feet distant from the "Mamei" flotilla he first recognized them and immediately ordered "Montrose's" engines to be reversed, that this was done and

[5] This rule, 33 U.S.C.A. § 203, provides, "When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other."

[6] This rule, 33 U.S.C.A. § 203, provides, "If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

[7] Cf. Regulation 11 of Rules and Regulations prescribed for the Navigation of the Chesapeake and Delaware Canal, cited supra, f.n. 4. See also Art. 18, Rule VIII, of Pilot Rules for Inland Waters governing overtaking vessels, 33 U.S.C.A. § 203.

caused "Montrose's" bow to "back to port." In this connection, Captain White testified that "Montrose," unlike "any other boat" backs to port rather than to the right and that he was well aware of this idiosyncrasy when he ordered her engines reversed. Whatever the cause, "Montrose" did veer abruptly to port, coming into collision with "Mamei's" port bow near the anchor. This was clearly a breach of navigational duty under the circumstances. Cf. The Gwynedd, 3 Cir., 1937, 91 F.2d 112. We conclude, therefore, that "Montrose" was not only at fault but that such fault was "obvious" and "inexcusable": See The Victory & The Plymothian, 1897, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519.

To avoid the full consequences of Captain White's improper navigation, appellant contends that "Caspian" and "Mamei" were also at fault. Principally, he argues that "Caspian's" lights were so "obscured" by certain king posts on "Mamei's" main deck as to require "Mamei" herself to exhibit a starboard running light. Appellant relies on Section 312.16 of the Regulations promulgated by the Board of Supervising Inspectors,[8] which provides, "Barges or canal boats towing alongside a steam vessel shall, if the deck, deck houses, or cargo of the barge or canal boat be so high above water as to obscure the side lights of the towing steamer when being towed on the starboard side of the steamer, carry a green light upon the starboard side; and, when towed on the port side of the steamer, a red light on the port side of the barge or canal boat; and if there is more than one barge or canal boat abreast, the colored lights shall be displayed from the outer side of the outside barges or canal boats."

However, this rule by its very terms does not apply to the situation existing here, in which the barge was being towed by two tugs, one on either side. We are unable to find any statutory rule, or one based upon statutory power, which requires a barge being towed by a tug on either side to display her running lights as asserted by appellant. The omission to so provide cannot be regarded as a mere oversight. On the contrary, it seems to us that such an omission must be regarded as intentional. There is a sound practical reason for this: since the barge has a tug on each side, the outboard running light of each tug would compensate for any inability to see the inboard running light of the other tug. Thus, in the case at bar, even assuming an obscuration of "Caspian's" starboard light by the king posts, since "Caspian" was on "Mamei's" port quarter and "Hudson" was on "Mamie's" starboard quarter, "Hudson's" starboard light admittedly not obscured would compensate for any lack of sight of "Caspian's" starboard light. It may very well be that exhibition by "Mamei" of both her running lights in this situation would merely serve to confuse a vessel approaching from an opposite direction. Since neither Congress nor the navigational authorities have made any requirement that a barge being towed by a tug on either side should display both her running lights in circumstances like those under discussion, we must conclude that no reason exists for such requirement, and consequently we should be hesitant to find one in this case.

In any event, we are not convinced that any obscuring of "Caspian's" lights either existed in the case at bar or contributed to the collision.

"Mamei" is a barge, 355 feet in overall length with a fifty-two foot beam. Her main deck was eight feet above the water line (as she was then laden). Back aft, about three hundred feet from the stem, she has a poop deck wherein is located her bridge and wheelhouse. The bridge rested about twenty-four feet above the water line. On either side of the main deck, four king posts stand. These are metal standards, eighteen inches in diameter, spaced fifty feet apart and rising to about twenty-eight feet above the water line. Captain Middleton testified that standing on the bridge deck his line of sight forward cleared the tops of the king posts. The learned trial judge concluded that the king posts "in view of the slight curvature of the canal at the point of collision, provided at most but momentarily obstruction to the running lights of the 'Caspian,' and a competent lookout in view of this space, could have observed the same." We have reviewed the record including the exhibits and can find no reason to set aside this finding of fact other than Captain White's testimony denying that he observed "Caspian's" running lights. This testimony seems to us to be rather inconsistent with his statement that he saw *both* of "Hudson's" running lights. "Hudson" on the

---

[8] Pursuant to provisions of 33 U.S.C.A. § 157.

starboard quarter and "Caspian" on the port quarter of "Mamei" were in parallel positions and certainly the king posts can be assumed to have equally obscured "Hudson's" lights if they constituted an obstruction at all. At least, this would have been necessarily true during the time that "Montrose" in making the bend crossed "Mamei's" bow to "Mamei's" port which put "Hudson" on Captain White's far side so that the king posts were in his line of vision to "Hudson's" running lights. Further, the constant moving of all the vessels throws doubt on the contention that "Caspian's" port running light was obscured by the king posts.[9] In addition, it is undisputed that "Mamei" displayed on either end of her yardarm, aft of the wheelhouse, two white all horizon lights. She also carried a lighted oil lamp on her port bow to signify that she was being towed. Of course, Captain White denies that he observed such light. Positive testimony that a light was burning is entitled to more weight than negative testimony that the light was not seen: see The Buenos Aires, 2 Cir., 1924, 5 F.2d 425, 429.

We must conclude, therefore, that the running lights of the "Mamei" flotilla met the navigational requirements under the circumstances.

Appellant further contends that there was not a proper lookout maintained on either "Mamei" or "Caspian." "Mamei's" bridge is 312 feet aft of her stem and was about 24 feet above the water line. On the bridge were Captain Middleton, navigation officer in charge of the flotilla, Captain Paulsen of "Mamei" at his side, and on the same level, in the wheelhouse, the helmsman. The view forward was unobstructed. Appellant's contention rests in the last analysis on the assertion that lookouts must always be stationed forward in the "eyes of the ship", relying on The Ottawa, 1865, 70 U.S. 268, 18 L.Ed. 165. We do not agree that *under all circumstances* lookouts must be stationed well forward. In The Ottawa, *supra,* the Court held that on a dark night *with the view obstructed* the pilot house is not the proper place for a lookout. On the night of this collision, it was clear with excellent visibility. We conclude that "Mamei's" lookouts were proper under the circumstances since Captain Middleton and Captain Paulsen had an unobstructed view: The Catalina, 9 Cir., 1938, 95 F.2d 283; Puratich v. United States, 9 Cir., 1942, 126 F.2d 914.

In any event, appellant would have to show not only that there was an absence of proper lookouts but also that such a lack of lookouts contributed to the collision. Fault alone is insufficient to engender liability. Causal relationship between the fault and the collision is essential: The Dexter, 1874, 90 U.S. 69, 23 L.Ed. 84; The Victory & The Plymothian, 1897, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; The Umbria, 1897, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; M. J. Rudolph, 2 Cir., 1923, 292 F. 740.

Under the circumstances of this case we conclude that the presence of lookouts up forward on the "Mamei" would not have prevented the collision.

We agree with the learned Court below that Captain Middleton did not err in proceeding eastward without giving the danger signal after failing to receive an answer to the one-blast signal for a port to port passing. It was not unreasonable for Captain Middleton to assume that "Montrose's" silence constituted assent to the proposed port to port passing: see The Kinetic, 3 Cir., 1930, 40 F.2d 258, 259, particularly since such a passing was the proper and normal kind in view of the conditions prevailing and since the "Mamei" flotilla had the right of way.

This situation is unlike that in General Seafoods Corporation v. J. S. Packard Dredging Co., 1 Cir., 1941, 120 F.2d 117, which held the "Trim" contributorily at fault for the collision with the "Exeter" because of failure to give seasonably the danger signal as required by Rule III, Art. 18, of Inland Rules.[10] There, the captain

---

[9] Indeed, it is difficult to accept Captain White's testimony that he first saw two white lights lined up vertically on the north side of the canal, close to the northern bank, and a set of red and green running lights, close to the southern bank. The width of the canal at this point is approximately 250 feet. The total breadth of the "Mamei" flotilla was 94.2 feet. "Mamei," "Hudson" and "Caspian" were never separated during the transit of the canal. In fact, the "Caspian's" white lights could not have been on the other side, close to the north bank and the "Hudson's" red and green lights on the south side, close to the southern bank. Quaere, whether they so *appeared* to Captain White.

[10] 33 U.S.C.A. § 203.

of "Trim" testified that, "he had remarked upon the erratic course of the 'Exeter' from the moment he saw her and had frequently expressed failure to understand her course or intention": General Seafoods Corp., etc., supra, 120 F.2d at page 119. Here, no evidence points to such doubt on the part of Captain Middleton of the "Mamei."

▮ Indeed, viewing the entire record, this would appear to be a proper case for the application of the rule of The City of New York, 1893, 147 U.S. 72, 85, 13 S. Ct. 211, 216, 37 L.Ed. 84, where the Court stated, "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." See also The Ludvig Holberg, 1895, 157 U.S. 60, 15 S.Ct. 477, 39 L.Ed. 620; The Victory & The Plymothian, 1897, 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; Woodruff v. Delaware L. & W. R. Co., 2 Cir., 1942, 130 F.2d 121, 123, where Judge Learned Hand remarked that in such a case, "we will not too jealously scrutinize the navigation of the other" vessel. We conclude that the faults of the "Montrose" were solely responsible for the collision and that this is not a proper case for apportionment.

Therefore, the decree of the District Court is affirmed.

BIGGS, Circuit Judge (concurring).

While I concur in the judgment of the court I cannot agree with the construction placed by the majority on Section 312.16* of the Pilot Rules for Inland Waters, United States Coast Guard. The evidence shows that the "Mamei's" superstructure obscured the starboard side light of the "Caspian" and the port side light of the "Hudson". Hence, under what I deem to be the correct interpretation of Section 312.16 the "Mamei" was required to display a green light on her superstructure on her starboard side and a red light on her superstructure on her port side. In my opinion the failure to display these lights in no wise contributed to the collision and the case is not one for contribution under the "major and minor" fault doctrine of divided responsibility. This concurring opinion is filed solely because I think that the majority's interpretation of the pertinent section will greatly heighten the risk of collision in the inland waters subject to the rule.

---

* Quoted in full in the majority opinion.