POLING RUSSELL, Inc. v. UNITED
STATES et al.

UNITED STATES v. NEWTOWN CREEK
TOWING CO. et al.

THE POLING BROS. NO. 12.

THE J. RAYMOND RUSSELL.
THE DOVER.

United States District Court
S. D. New York.

March 22, 1951.

650

Alexander & Ash, New York City (Edward Ash, and Joseph A. Calamari, New York City, of counsel), for Poling Russell Inc.

John F. X. McGohey, U. S. Atty., New York City, by Edward R. Downing, and Herbert Ost, Asst. U. S. Atty., New York City, for the United States.

Bigham, Englar, Jones & Houston, New York City, (Andrew J. McElhinney, New York City, of counsel), for Newtown Creek Towing Co., et al.

CONGER, District Judge.

This suit arises out of a collision between the U. S. S. Dover and the barge Poling Bros. No. 12 in tow of the tug J. Raymond Russell in the East River early in the morning of January 10, 1943.

The barge owner, Poling-Russell, Inc. sued the United States, who in turn impleaded the motortug J. Raymond Russell, the Newtown Creek Towing Company, the tug owner and the Russell Bros. Towing Co., Inc. who had the tug under bareboat charter. Subsequently the United States brought an independent libel against all the other parties to the first suit; and the two actions and impleading petition were consolidated for trial.

At the time of the collision the U. S. S. Dover was a commissioned vessel of the U. S. Navy in service as a gunboat and naval training ship of 1136 tons. She was 252 feet long with a beam of 40 feet and was powered by a triple expansion reciprocating steam engine with two propellers.

The Dover was on a voyage from Toledo via Boston to Staten Island, New York, and shortly before midnight on January 9, 1943, had picked up a pilot at City Island and had proceeded through Hellgate Channel and down the East River. On the bridge of the U. S. S. Dover at the time were the pilot, the executive officer, Navigator Shumway, Captain Brown, officer of the deck Waters, the wheelsman and signal man; a lookout was stationed on the bow of the ship. As it passed under the Brooklyn Bridge making 9½ knots, personnel on board the Dover observed the red running light and white towing lights of a tug which was later identified as the J. Raymond Russell. The tow was not observed but the towing lights indicated one was alongside.

The Russell was about ¾ of a mile away and was entering the East River on a course around the Battery. The Dover's position in the channel was a little to the right of center, or approximately 750 feet off the Manhattan pier ends. When the red light of the Russell was first sighted it appeared about a point off the starboard bow of the Dover. At this time the Dover sounded a two-blast signal proposing a starboard to starboard passing. The Dover heard no response to this signal; and the red light on the Russell was crossing from the starboard bow to the port bow of the Dover. Observing this, the Dover sounded a one-blast signal, and changed course 5 to 8 degrees to the right in order to pass under the stern of the Russell, the Dover pilot assuming that the Russell was navigating toward the Brooklyn shore. No answer was heard from the Russell. At the time of this signal, the Russell's red light was showing more than a point on the Dover's port bow, and seemed to be broadening. About a minute had elapsed since the two-blast signal. Less than a minute after her first one-blast signal, the Dover sounded another one-blast signal. Almost simultaneously the Russell's red light began closing and her green or starboard light opening. The Dover instantly put her rudder hard right, and her engines full astern. The Russell was heard to sound the danger signal. About a minute later the bow of

the Dover struck the Russell six to ten feet abaft of her starboard bow. The Dover personnel did not actually see the barge until the vessels were within 70 to 100 feet of each other.

The Poling Bros. No. 12 is an oil barge 208 feet long, 42 feet in width, 14 feet in depth, with a free-board of about 3 feet. At the time of the collision it was half loaded, and made fast to the port side of the tug. Her bow protruded 125 to 135 feet in front of the tug's bow.

Her master, Captain Mikalsen, testified that she displayed two bright lights on her port side, one forward and one aft. The forward light was ten feet aft of the bow, and was raised about four feet above the deck. The aft light was five or six feet forward of the stern and was flush with the deck. The lights showed about 200 degrees around the horizon. Fisk, the tug pilot, corroborated Mikalsen, although he indicated that both lights were above the deck. No one on board the Dover observed these lights before or after the collision. Captain Haughn, the Dover pilot, observed two stern lights hanging from the barge's deckhouse after the collision. They had not been observed prior thereto.

The barge had no lookout, the captain having been in his cabin prior to the collision, and two other hands having been asleep.

The tug, J. Raymond Russell, is powered by a Diesel engine of about 525 horsepower and has a burden of 137 gross tons. Early in the morning of January 10, 1943, she was rounding the Battery on a course up the East River with the barge Poling Bros. No. 12 in tow on her port side. The Russell was displaying a white light forward, red and green sidelights and two white towing lights, which indicated she had a tow alongside. The pilot, Fisk, was navigating the Russell and her deckhand was in the pilothouse acting as lookout.

The Dover was first observed by those on board the Russell when the gunboat appeared to be under the Brooklyn Bridge in about the center of the East River and coming downstream. She was displaying a white masthead light, a range light and her red and green sidelights. The lights appeared to be about ¾ of a mile away. The Russell at the time was about 400 to 450 feet off Pier 4, Manhattan, before she had completed her swing around the Battery. Her heading was toward the Brooklyn shore.

About the time the Russell was off Pier 5, she sounded a two-blast signal to the Dover for a starboard to starboard passing, and immediately put her wheel to the left and began to edge in toward the Manhattan shore. The Russell's pilot heard no answer to the signal but continued ahead assuming the starboard to starboard passage would be effected. The speed of the Russell against the two-knot ebb current was 2 to 2½ knots. When the Russell arrived at a point about 350 feet off Pier 6, she sounded a danger signal and reduced her speed to half-speed. The Dover appeared to be off Pier 13 or 14, Manhattan, and was heading toward the Russell on a converging course with the Manhattan shoreline. The pilot of the Russell continued to anticipate a starboard to starboard passing. When the Russell reached about Pier 7, and the Dover appeared to be off Pier 9 or 10, the Russell blew another danger signal and backed her engines full speed, at the same time putting her wheel hard over left. About the time when the Russell blew her second danger signal, the Dover took a sheer toward the Manhattan shore, and the bow of the Dover shortly after struck the barge.

■ Since the barge was not in charge of its own navigation it carries no burden to justify it. That problem remains with the Russell. In addition, I am satisfied that no breach of duty on the part of the barge contributed to the collision.

The Government charges that the barge was at fault for failing to display the required lights.

■ Captain Mikalsen, the barge captain, and Fisk, the tug pilot, both testified that the barge was displaying the proper lights. It is true that the Dover personnel did not observe them. But the fact that they were not observable on the Dover does not in itself negative the assertion that they were on. The affirmative asser-

tions of Mikalsen, who was charged with the duty to display the lights, and of Fisk are entitled to greater credence than the testimony of those on board the Dover that the lights were not seen. The Buenos Aires, 2 Cir., 1924, 5 F.2d 425; The Mamei, 3 Cir., 1945, 152 F.2d 924.

 The Government further charges that the lights, assuming they were on, did not comply with the Rules in that the forward light did not show an unbroken arc around the horizon. Mikalsen admitted the light showed only 200 degrees; and this is a violation of the Rules.

And the barge's admitted failure to have a lookout was an additional violation. Article 29, Inland Rules, 33 U.S.C.A. § 221.

But the barge's derelictions were not a substantial factor in causing the accident.

Captain Haughn, the temporary Hellgate pilot of the Dover, testified that he observed the two towing lights of the tug, and he then knew that it had a tow alongside. I quote from his testimony.

"Q. When you first saw this red light on the tug, what other lights did you see on the tug? A. I saw her towing lights.

"Q. How many towing lights? A. Two.

"Q. What color were they? A. White.

"Q. One above the other? A. Yes, sir.

"Q. What did that indicate to you? A. That she was towing a barge alongside.

"Q. Barge alongside? A. Yes, sir.

"Q. And when did you see those towing lights in connection with when you first observed the right light on the tug? A. Repeat that, please.

"Q. Let me put it this way. As soon as you first saw the red light on the tug did you see these two white towing lights? A. Yes, sir, I saw them.

"Q. Then from the first moment that you observed the tug or the red light on the tug you knew that she had a barge in tow alongside, didn't you? A. Yes, sir.

\* \* \* \* \* \*

"Q. When you first saw the red light and saw these two white lights, you knew that she had a barge alongside? That had

to be taken into consideration in your navigation, didn't it? A. Yes, sir.

"Q. And you did shape your navigation to consider the fact there was a barge alongside of that tug on one side or the other, didn't you? A. Yes, sir.

"Q. And you made all allowances to clear that barge no matter which side the barge was on? A. Yes, sir.

"Q. Isn't that correct? A. Yes, sir, that is correct."

It is apparent, therefore, that the Dover shaped its course with the position of the tow in mind, and that the statutory violations of the barge, assuming it displayed no lights, or assuming it displayed improper lights, did not influence its course.

The failure of the barge to post a lookout stands in the same light. The testimony of Fisk shows that the Dover was timely observed from ½ to ¾ of a mile away, and a lookout on the barge would not have contributed anything to his observations. Cf. Rice v. U. S., 3 Cir., 1948, 168 F.2d 219.

I hold that the barge was not at fault.

The main problem, therefore, is to fix the liability between the tug and the Dover.

In this part of my decision I shall refer to the United States of America as the libellant.

 The libellant asserts various reasons for attributing fault to the Russell. They shall be discussed seriatim.

Firstly, the libellant argues that the Russell was at fault for failing to shape her course for a starboard to starboard passing after the Dover had signalled for such passing.

I am not impressed with this argument because the testimony shows that the Russell did not hear the two-blast signal and, in addition, that the Russell was shaping her course for a starboard to starboard passing. Her pilot, Fisk, testified that she rounded the Battery about 400 to 450 feet off South Ferry and that she was about the same distance off Pier 4, Manhattan, when the Dover was first observed; that she was about 350 feet off Pier 6, Manhattan, when she sounded her first danger signal, having put the wheel slightly to the left to edge

gradually toward the New York shore. The collision occurred about 300 feet off Pier 7, Manhattan.

I think these facts sufficiently show that the Russell did anticipate a starboard to starboard passing and maneuvered to effect such passing. The plottings of Lieut. Shumway of the Dover confirm these facts.

Second, the libellant contends that the Russell was at fault for changing course and speed as the privileged vessel in a crossing situation and in violation of Article 21 of the Inland Rules, 33 U.S.C.A. § 206.

No claim was made in the libellant's pleadings as originally filed or as amended at the trial that the vessels were meeting in a crossing course situation. In fact, the pleadings charge the Russell with fault for failing to pass starboard to starboard.

The captain, pilot and navigator of the Dover all testified that the vessels were in positions calling for a starboard to starboard passing when they first came into view of each other and that there was nothing to prevent them from carrying out such a passing. The Dover sounded a two-blast signal to indicate such intention. The pilot of the Russell regarded it as a starboard to starboard passing situation.

The fact that the red light on the Russell crossed from starboard to port on the rounding course did not necessarily indicate a crossing situation. The Dover's pilot knew that tows rounding the Battery head first toward Brooklyn as they gradually straighten up toward the Manhattan shore, and this is what he expected the Dover to do. At that time the Dover was in the middle of the river up near the Brooklyn Bridge about 750 feet off the Manhattan pier ends while the Russell and her tow were 400 to 450 feet off the Manhattan pier ends so that a starboard to starboard situation was indicated.

Further the proof shows that the Russell's only change of course was a rounding course, which the Dover anticipated, and it reduced speed at a point about 350 feet off Pier 6 when it heard no response to its danger signal.

Article 21 of the Inland Rules is inapplicable.

Third, the libellant contends that the Russell was at fault for maneuvering to bring the Russell on a converging course with the Dover when the Dover's course was apparent.

It is true that after the Russell first observed the Dover, the latter's course was angled toward the New York shore. When the Dover reached the vicinity of Pier 18 or 19, the Russell sounded a two-whistle blast (unheard by the Dover). However, the Russell still anticipated that the Dover would pass starboard to starboard, and the tug pilot testified that such passing was possible even when the Dover reached the vicinity of Pier 13 or 14 if the Dover had ported its wheel. In other words, the Dover's course was not apparent, and at this point the Russell blew the danger signal. Whether the Russell could have maneuvered to avoid the Dover's course at this time is not clear.

I am not too impressed with this argument, especially in view of what I regard as the principal causes of the accident.

Fourth, the libellant contends that even if the situation is regarded as a starboard to starboard passing throughout, the Russell was at fault for violation of Article 18, Rule 1 of the Inland Rules, 33 U.S.C.A. § 203, and for failure to stop and back as required by the situation.

Article 18, Rule 1, wherein applicable, provides: "But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other."

Since I am presented with a situation in which each side claims to have sounded a two-blast signal, neither one hearing the other, I am at a loss to know how the Rule may be deemed applicable and blame directed. Obviously, I cannot apply the Rule.

■ I do not think the Russell was at fault in failing to stop and back as the situation presented itself. It is true that the Dover was heading toward the Manhattan

shore, but the tug pilot knew that the vessels were in a starboard to starboard passing situation, he anticipated such a passing, and he realized that the Dover had ample time and room to effect such a passing. Further, the tug pilot had the right to assume that the Dover would observe the Rules of the Road. The Victory (The Plymothian), 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519; Lake Erie Transp. Co. v. Gilchrist Transp. Co., 6 Cir., 1906, 142 F. 89. Fisk testified that he reduced his speed to half at the time he sounded the first danger signal off Pier 6 because of the uncertainty of the Dover's course. A collision was not imminent at the time and it would have been risky for him to stop and back for there was a possibility of the tow getting out of control in the tide. He would then have been unable to take action, should it have become necessary. In the case of The Syracuse, 9 Wall. 672, 676, 76 U.S. 672, 676, 19 L.Ed. 783 the Supreme Court thus comments on the difficulties of navigation of such a tug: "A tug with vessels in tow is in a very different condition from one unencumbered. She is not mistress of her motions. She cannot advance, recede, or turn either way at discretion. She is bound to consult their safety as well as her own. She must see what clears her of danger does not put them in peril. For many purposes they may be regarded as part of herself. They have the benefit of her traction and she the burden of their inertia."

However, a fault for failing to stop and back might well be attributed to the Dover. Its conduct will be discussed hereafter.

Fifth, the libellant contends that the Russell was at fault for failure to have her tow under control.

This might be a nice argument if there was any evidence in the case to support it. As far as I know it is not adverted to in the pleadings or supported by testimony on the trial. The only possible references to such a condition that might suggest this thought to libellant are Fisk's remark that one must be careful not to trip the tow in the tide and Captain Haughn's assertion that she "swung wide" in going around the Battery. I am sure that no one would infer that she lost control of the tow from these meager bits.

Sixth, the libellant contends that the Russell and the tow were gravely at fault for inattention to signals and for improper or no lookouts; and that this was a contributing cause of the collision.

I have disposed of this point as far as the tow was concerned so that the discussion here will relate to the tug and the Dover.

The evidence shows that the Russell did not hear any of the signals of the Dover and likewise that the Dover did not hear any of the Russell's signals except the danger signal sounded immediately prior to the accident. I have no basis for disbelieving that the signals were not given by the two vessels. I care not to indulge in the Russell's theory of simultaneous whistles although it is a possibility. It is strange that the officers on the Dover did not hear the Russell's two-blast signal and first danger signal when the windows on the bridge were open, but I cannot find that the Russell did not blow them because of that. It is true that the Russell's lookout was a deckhand who had other duties assigned to him in case their necessity arose, but there is no evidence that he was performing duties other than lookout prior to the collision. In any event the evidence shows that the Russell observed the Dover in time for any possibilities so that this situation did not contribute to the collision.

I have disposed of the Dover's arguments with the exception of one in connection with freedom from fault. I now consider that in conjunction with what I regard as the real causes of the collision and the blame therefor.

After the Dover first observed the port light of the Russell, it gave a two-blast signal for a starboard to starboard passing. This was perfectly proper since the situation of the vessels when they first observed each other called for such passing. The Dover was then just below the Brooklyn Bridge near the middle of the river, about 750 feet off the Manhattan pier ends while the Russell and the tow were 400 to 450 feet off Pier 4, Manhattan, on a course

around the Battery. In that situation there was substantial clearance for a starboard to starboard passing. At this point, however, the Dover personnel became confused because the Russell's red light had passed from the Dover's starboard bow to her port bow [1] and, in addition, the Russell had not answered her two-blast signal. Still, at that time, the pilot of the Dover expected the Russell and the tow to turn toward the Manhattan pier ends on a course up the river even though upon observation then, its heading was toward Brooklyn. So that it was not so much the apparent heading of the red light on the Russell that caused the confusion as it was the Russell's failure to answer the Dover's two-blast signal.

The Russell contends that this confusion stemmed from the mistaken impression of the pilot and master of the Dover that the starboard to starboard passing could not be carried out unless the Russell consented by a responsive two-blasts, citing various cases including The Bellhaven, 2 Cir., 1934, 72 F.2d 206. But this case and the others depend upon Rule I of Article 18 of the Inland Rules which applies to situations where vessels are meeting end on or nearly end on, or, where " * * * by night * * * each vessel is in such a position as to see both the sidelights of the other." There was no such situation here when the Russell was initially observed. So the Dover personnel were not necessarily mistaken in their impression and they might well have been confused at this point.

It was their duty, therefore, to comply with Rule III of Article 18 of the Inland Rules, 33 U.S.C.A. § 203, which provides: "If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

They did not so comply. The vessels were then approximately 1800 feet from each other and had sufficient time to avert danger.

In addition, the Dover continued at a speed of 9½ knots through the water despite the confused state of her personnel. The tide was running with a speed of 2 to 2½ knots so that the Dover was making a speed of between 11½ to 12 knots over the ground. She did not reduce speed until she was 200 to 350 feet of the Russell when she reversed full speed but it was impossible to reduce her headway in less than 450 feet.

I regard this as the principal cause of the collision. If the Dover had reduced speed or stopped at any time between the two-blast signal and the full speed reverse order, it is very likely the collision would have been averted. There was no other vessel in the vicinity nor any apparent reason why such action could not be safely taken.

Instead the Dover sounded successive one-blast signals proposing a port to port passing. Whether this was improper under the circumstances is immaterial since the Russell did not hear them anyway. On top of this, the Dover, after her first one-blast signal, proceeded, without an assent from the Russell, to change her course 5 to 8 degrees to the starboard. Since the Dover had initially considered the situation as one for starboard to starboard passing and had become confused because of the circumstances related, she risked the consequences of such a maneuver for the Russell might well have been relying upon her two-blast signal. In fact the Russell was not relying upon such signal but had sounded her own two-blast signal for a starboard to starboard passing. The testimony shows that the Dover's course was set for a little to the right of Castle William Light on Governor's Island, which course would have brought her to a point about 400 feet off Pier 7, Manhattan, rather than 300 feet off where the collision occurred.

In view of all the circumstances I believe that the Dover is solely responsible for the collision. I can find no fault with the navigation of the Russell and I am unable to at-

---

1. According to the testimony of Captain Brown of the Dover it was the Dover's starboard maneuver at the time she gave her first one-blast signal that put the red light of the Russell on the Dover's port bow.

tribute causation to the statutory violations of the tug.

Poling Russell, Inc., as owner of the barge Poling Bros. No. 12 is entitled to recover from the United States of America for the damage to its barge.

Settle decree in accordance with the foregoing.