### ANGLO-SAXON PETROLEUM CO., LIMITED, OF LONDON, ENGLAND v. UNITED STATES.
### THE DAVILA.

No. 964.

United States District Court
D. Massachusetts.

Jan. 26, 1950.

Thomas H. Walsh, of Boston, Mass., and Reid, Cunningham & Freehill, New York, New York, Proctors for The Anglo-Saxon Petroleum Co., Ltd.; Herbert P. Reid, Charles S. Haight, Donald E. Fobes, all of New York, New York, and Thomas H. Walsh, of Boston, Mass., Advocates, for plaintiff.

William T. McCarthy, United States Attorney, and Edward O. Gourdin, Assistant United States Attorney, both of Boston, Mass.; H. G. Morison, Asst. Atty. General, R. J. Hogan, Lt. Comdr., Navy J.A.G., Thomas F. McGovern, Attorney, Admiralty & Shipping Section, Department of Justice, all of Washington, D. C., for the United States of America.

SWEENEY, Chief Judge.

These are cross-libels in Admiralty arising out of a collision between the destroyer, U.S.S. Wilkes, and the oil tanker Davila, owned by the Anglo-Saxon Petroleum Co., Ltd., of London, England.

Findings of Fact

When the collision occurred around 1:00 A.M. east of Boston and north of Race Point on April 8, 1942, both vessels were unlighted and under the necessity of sounding as few signals as possible because we were at war. The Wilkes, escorting the cruiser, U.S.S. Augusta, was running ahead of her, northbound, on a zigzag course. The Davila was port hand column leader in a three-column convoy of five ships southbound from Halifax to New York.

The Wilkes is 340 feet long, 34 feet in maximum beam, has twin screws and a speed in excess of 30 knots. Prior to the collision her course was 000°T and her speed 17½ knots. She was equipped with air search radar, an instrument seriously limited in the reliability with which it indicated the bearing of echoes recorded upon it, because it was designed to give notice of aircraft approach and not as a navigational aid.

Testimony conflicts regarding radar reports made to the bridge of the Wilkes during the ten minutes which preceded the collision. I find that only two reports were received which were material to the collision. The first was of a 30° bearing at a range of 3,500 yards, and was received about eight minutes before the collision. The second was also of a 30° bearing at a range of 2,300 yards, reported ninety seconds later. This second report from radar was made as the result of Commander Kelsey's request aboard the Wilkes that the target reported at 3,500 yards be followed up. Commander Kelsey changed course from 000°T to 70°T upon receiving the second report, which indicated a moving object on a constant bearing coming towards the Wilkes, therefore on a collision course with the Wilkes. This change in course would have been adequate to avoid collision had the speed and course of the Davila corresponded to that indicated by these two radar contacts.

However, these contacts could not correspond to the known course and speed of the Davila or her convoy before the colli-

sion. On the other hand, they could correspond to the courses and speeds of two targets if one of them was the convoy and the other was one of two British destroyers which were escorting the convoy. While the positions of these escorting war ships are unknown, the rate of speed which one of them would have had to travel to account for the second report at 2,300 yards within the ninety-second interval between the reports would not have been greater than 35 knots, a rate which is possible to a destroyer.

The reason for this is the limitations which characterize radar of the air search type which the Wilkes carried. This radar had no map-like PPI scope which would permit a continuity of contact with targets. The radar antenna made a slow revolution through 360°. A target could be observed only for a few seconds during this revolution as a flash of light or a "blip" on the scope. This made it very difficult for the radar operator to observe the exact bearing of a target during the short period of time it appeared on his screen, and also made it uncertain whether, when he observed a blip a second time after one revolution of the antenna, it represented the same object.

■ Expert testimony presented on behalf of the Wilkes is entirely credible that SC radar of the type aboard the Wilkes was not reliable for navigational purposes. The Wilkes sounded no signals nor displayed lights when she changed course because the object or objects thought to be within collision range had not been identified as friendly. The failure of the Wilkes to carry navigational radar did not make it unseaworthy.

About a minute before the collision Commander Kelsey aboard the Wilkes sighted the Davila. The Wilkes had no lookout aboard her bow because muzzle blast from her guns when trained forward would have killed him, and she had to be prepared to fire on a moment's notice. At this time the visibility of an unlit object was about 700 yards. Each ship sighted the other at about 600 yards. Immediately thereupon the Wilkes took every possible measure to avoid collision but was unable to do so. The stem of the Davila at 20° struck the

port side of the Wilkes between her bridge and her stack. The Davila's stem was twisted from starboard to port, and damaged for about 20 feet from the bow. She penetrated the Wilkes' port side for about 12 feet, cutting open the fire room.

The Davila was a British motor tanker built in 1938, length 483 feet, beam 57 feet, depth 33 feet, weight 12,000 deadweight tons. Her maximum speed was 12½ knots light and 11½ knots loaded. Her bow was about 160 feet forward of her bridge. She was port-hand column leader in position 11 of a convoy of five merchant ships bound southward from Halifax. At the time of the collision the convoy was not sailing on the course and according to the schedule prescribed by its routing instructions. If the convoy had been on course and schedule at the time of the collision it would have been three miles to the westward of and one hour's running distance beyond the point of collision. For more than three hours prior to the collision the Davila had been running at a speed of 9–9½ knots on a course of 193°T. There were ships 400 yards to the Davila's starboard and 600 yards astern. There were none in the convoy on her port hand. The ship aft was in plain sight. At the starboard bridge wing there was one lookout on watch, and the Mate and an apprentice officer, Parker, were at the port bridge wing.

The Mate and Parker sighted the Wilkes simultaneously at a distance of approximately 600 yards, and about one minute before the collision, 16° to 20° on the Davila's starboard bow. During that minute's interval the Mate increased the Davila's speed slightly, and turned her to the left, measures which to some extent contributed to the collision, and certainly did nothing to avoid it.

■ The Davila did not have a lookout posted at the bow although, as the Master testified, there was no reason why he could not have had one there. These vessels were both running without lights in an area well known to be heavily burdened with traffic. With the distance of about 160 feet between the bridge and the bow I consider the Davila to be at fault in not maintaining a bow lookout. A lookout

there would have been in a much better position to observe the Wilkes than a man on the bridge. The Vedamore, 4 Cir., 1905, 137 F. 844; Watts v. United States, D.C. S.D.N.Y.1903, 123 F. 105; New England Maritime Co. v. United States, D.C., 55 F. 2d 674, affirmed sub nom. United States v. Gould, 1 Cir., 1934, 73 F.2d 1016; The Patria, D.C.S.D.N.Y.1899, 92 F. 411; The Corozal, D.C.S.D.N.Y.1944, 62 F.Supp. 123.

█ Proctors for the Davila have contended that the Wilkes was in the position of the burdened vessel on a crossing course at the time she received notice of objects on her starboard bow at 3,500 yards, and that therefore the Wilkes will be presumed at fault until proven otherwise. The United States, on the other hand, contends that the courses were not crossing but meeting, because the angle formed by the courses of the two ships was only 13°. The Wilkes was not the burdened vessel in a crossing situation because the giveaway duty of the burdened vessel, as outlined in Article 19 of the International Rules, 33 U.S.C.A. § 104, is predicated upon a corresponding duty of the privileged vessel to maintain course and speed. The burdened vessel cannot predict that the privileged vessel will do this until it has reason to believe the privileged vessel is aware of the presence of the burdened vessel. Lind v. United States, 2 Cir., 1946, 156 F.2d 231; Publicover v. Alcoa S. S. Co., 2 Cir., 1948, 168 F.2d 672, 674. The Wilkes being blacked out had no reason to believe the Davila was aware of her at 2,300 yards or more, and therefore was not required to act under the rules governing either meeting or crossing situations, but rather to use good seamanship in the premises. In this regard her change of course from 000° to 70° cannot be charged to her as a fault, because on the basis of the information available to her bridge this was adequate to avoid collision. Furthermore, the Wilkes had the duty to screen the cruiser, Augusta, from vessels which were potentially hostile; she therefore had to swing to starboard rather than port.

█ There has not been, nor can there be, a contention that the Wilkes was at fault for holding a speed of 15 knots until visually sighting the Davila. Although the Wilkes was aware of a moving object on her starboard bow, she had a duty both to the Augusta and herself to retain sufficient speed as to be maneuverable in the event of contact with a hostile vessel, and such speed as would prevent submarine attack against her. This duty privileged her to run such risk as she took of injuring the Davila in maintaining her speed of 15 knots.

There has been absence of dispute as well concerning the due care which the Wilkes took, upon sighting the Davila visually, to avoid collision. There is no evidence of negligence or dilatoriness and, to the contrary, there is evidence that the lookout aboard the Wilkes was alert, and that immediate and proper evasive action was taken to avoid the Davila when Commander Kelsey sighted her loom. Therefore the Wilkes is without fault in this collision.

█ A full minute elapsed between the time that the Davila sighted the Wilkes and the collision. Had there been a lookout on the bow he would have undoubtedly sighted the Wilkes sooner and thus increased the time intervening to the collision. In addition to this fault, the bridge action taken after the officers on the port bridge wing sighted the Wilkes did nothing to avoid collision, and probably made it more certain. The Davila's lights went on an appreciable interval after the Wilkes'. While this in no way contributed to the collision because the Wilkes was by then aware of the Davila's presence, none the less it is evidence that the Mate in charge of the Davila's navigation was slow to react to the danger of collision once he became aware of it. Each of these facts is a mark of poor seamanship and a fault.

### Conclusions of Law

From the foregoing Findings of Fact I conclude and rule:—

(A) That the Wilkes was without fault;

(B) That the Davila was at fault by reason of (1) failure to have a bow lookout, (2) incorrect helm and engine orders just prior to collision, and (3) slowness to react to awareness of danger;

(C) That the libel of the Anglo-Saxon Petroleum Co., Ltd., of London, England, should be dismissed, and that the United States should recover on its cross-libel after the usual reference to ascertain damage.