CAPT'N MARK, etc., et al.,
Plaintiffs, Appellees,

v.

SEA FEVER CORPORATION,
Defendant, Appellant.

No. 82–1041.

United States Court of Appeals,
First Circuit.

Submitted Sept. 17, 1982.

Decided Oct. 1, 1982.

As Amended on Denial of Rehearing
Nov. 1, 1982.

Richard A. Dempsey and Glynn & Dempsey, Boston, Mass., on brief for defendant, appellant.

Mark G. Furey and Thompson, Willard & McNaboe, Portland, Me., on brief for plaintiffs, appellees.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This claim and counterclaim for damages arose out of the collision of the F/V Sea Fever and the F/V John David in the early morning of February 18, 1978. The opinion of the court below amply sets out the facts, known and disputed, and we will not detail them here. As the parties stipulated to the amount of damages, the sole question before the court was that of fault. Resolution of that question was made difficult by the fact that the only eyewitnesses were the helmsmen of the two vessels, who offered conflicting testimony as to what occurred. The case necessarily turns on the credibility of the witnesses and the plausibility of their testimony.

That a collision occurred at all is perplexing. Both helmsmen were aware of the other boat while still several miles apart, the night was calm and moonlit, the boats were radar-equipped, and the accident occurred on an empty ocean 22 miles offshore. Nonetheless, the two vessels were somehow unable to avoid each other. Moreover, although the Sea Fever had been approaching from the John David's port, she was rammed on her own port side. In these circumstances it is not surprising that there is no satisfactory account of the accident.

■ The essential factual dispute concerns the maneuvering immediately before the collision. The Sea Fever—the burdened vessel—was proceeding northward without running lights.[1] Its helmsman, John Whipple, testified that while still two and one-half miles away he sighted the John David, which was heading westward, and that at a distance of one-half mile he adjusted his course to port in an effort to pass *in front* of the John David. Meanwhile, Robert Anderson, at the helm of the John David, had picked up the Sea Fever on radar at a distance of four miles. When the boats were a mile apart, he lost the Sea Fever in radar clutter; he testified that he opened the port door of the wheelhouse and "looked for the boat visually" but could not see her. Accordingly, he maintained his course and speed (as he was aware the privileged vessel is expected to do), "ready for the worst." The worst did indeed occur: the John David rammed the Sea Fever on the latter's port side, approximately ten feet forward of the stern. Whipple contends that at a distance of 300 yards he turned hard to starboard and that the John David must have turned to port just before the collision. Indeed, appellant's brief seems to accuse the John David of doing so maliciously, describing the alleged port turn as "a maneuver clearly designed to cause the collision." The appellees maintain, however, that the John David never changed course, that the Sea Fever had crossed in front of her before making the starboard turn, and that this maneuver brought the Sea Fever back into the John David's path. The district court accepted this version. In a careful and comprehensive opinion, it determined that the Sea Fever had committed numerous violations of the International Regulations for Preventing Collisions at Sea, 33 U.S.C. foll. § 1602 ("International Rules"), while the John David had committed none.

■ The scenario accepted by the district court is admittedly peculiar, but given the bizarre circumstances surrounding the colli-

---

1. Or so the district court found. The crewmembers of the Sea Fever testified that the lights were burning when they went below, leaving Whipple at the helm; Whipple was less certain. The John David's helmsman, Anderson, testified that the Sea Fever was unlit, that he later observed that her masthead light was covered by a can, and that the Sea Fever's captain had stated immediately after the collision that the running lights were not functioning. While the general rule is that affirmative testimony that a condition exists merits greater weight than negative testimony that it does not, *e.g., Sun Oil Co. v. S.S. Georgel,* 245 F.Supp. 537 (S.D.N.Y.1965), *aff'd,* 369 F.2d 406 (2d Cir. 1966), the most unequivocal testimony here is Anderson's. We cannot say that the district court's finding that the Sea Fever was unlit was clearly erroneous.

sion it is difficult to conceive of an explanation that would be any less dubious. We are no more impressed with appellant's version. Certainly we cannot say that the district court's findings are demonstrably incorrect, for we bear "in mind the heavy burden that is upon the appellant that we be firmly convinced that a mistake has been made [by the court below]." *CIA. Maritima San Basillio S.A. v. Shell Canada, Ltd.*, 490 F.2d 173, 174 (1st Cir. 1974). We can only rely on the district judge, who had the benefit of direct presentation of the evidence. Having reviewed the record, and looking at the evidence in the light most favorable to appellees, we cannot say that his findings were clearly erroneous. *See Pinto v. Fernwood,* 507 F.2d 1327, 1329 (1st Cir. 1979).

■ Accepting the facts as found by the district judge, we must determine if he made any errors of law. The evidence strongly supports his determination that the Sea Fever was seriously at fault. Under Rule 15 of the International Rules, she was the burdened vessel. Accordingly, she was obligated to take "early and substantial action to keep well clear," Rule 16, and, if possible, to pass astern of the John David, Rule 15. Yet the Sea Fever's helmsman, Whipple, conceded that he first altered his course to port, apparently in an ill-advised belief that he could pass in front of the John David. Whipple testified that he thereafter swung hard to starboard while still 300 yards from the John David, intending to pass to the John David's stern as the rule required. But the court was not bound to believe Whipple. Anderson testified that he at all times maintained course and speed. If so—and the court credited Anderson—the Sea Fever could not have done as Whipple testified. Instead, as the court found, she must then have crossed the John David's bow for the collision to have occurred. Such an action would, of course, be in flagrant violation of Rules 15 and 16, as the court found. *See also* Rule 8(a) ("Any action to avoid collision shall . . . be positive, made in ample time and with due regard to good seamanship."). The Sea Fever was guilty of two more specific viola-

tions of the rules as well: it did not exhibit running lights, *see* Rule 23(a), and, as appellant admits, it did not signal either its port or starboard turns, *see* Rule 34(a).

The question remains whether the John David was also at fault. She was the privileged vessel, her running lights were indisputably operational, and, accepting Anderson's testimony as the court was entitled to do, she maintained her speed and course at all times. Appellant charges, however, that the John David was nonetheless negligent in failing 1) to maintain a proper lookout, 2) to sound a danger signal, and 3) to take avoiding action. We deal with each of these in turn.

■ The International Rules require that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." Rule 5. Appellant claims that as a matter of law a "proper" lookout is one as far forward and low down as possible, with no other duties. *See* R. Farwell, *The Rules of the Nautical Road* ch. 10. There is some degree of support for this proposition in the case law, although usually in different circumstances involving larger vessels. *See, e.g., Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir. 1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 517 (1978); *In re Flota Mercante Grancolombiana, S.A.,* 440 F.Supp. 704, 715–16 (S.D.N.Y.1977). While we do not dispute that this would be the safest arrangement, we decline to hold that so onerous and unrealistic a requirement is imposed as a matter of law on small fishing vessels with limited crews running in circumstances such as these. The adequacy of the lookout must be evaluated realistically in light of all the circumstances. *Anthony v. International Paper Co.,* 289 F.2d 574, 580 (4th Cir. 1961). *See also The Mamei,* 152 F.2d 924, 929 (3d Cir. 1945), *cert. denied,* 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611 (1946). We cannot say that as a matter of law the John David's lookout was not "proper."

*Anglo-Saxon Petroleum Co. v. United States (The Davila),* 88 F.Supp. 158 (D.Mass.1950), relied on by appellant, hurts its case more than it helps. There the court found the Davila at fault for not maintaining a bow lookout while "running without lights in an area known to be heavily burdened with traffic." *Id.* at 160. In contrast, the John David was well lit, was in open seas, and was equipped with radar. Moreover, while the Davila's bridge was 160 feet from its bow, the John David measured only 40 feet from wheelhouse to bow. Thus, *Anglo-Saxon* does not endorse a flat requirement of a bow lookout and is manifestly distinguishable from the present case.

To be sure, Anderson's failure to see the Sea Fever immediately before the collision in itself presents a close question as to the adequacy of the lookout. Having spotted and then lost the vessel on radar, and being aware that the two vessels were on a collision course, Anderson was plainly under a duty to try to locate the Sea Fever visually. This he says he sought to do, and the court apparently felt Sea Fever's lack of lights justified his failure. Yet the night was clear and the moon an hour away from setting. Whipple testified that he could see the hull of the John David from 2,000 yards away and the waves breaking against the John David's bow from 300 yards. After the collision the crewmembers of the John David were able to see the white hull of the Sea Fever at some distance, although by then the cabin lights were on (Anderson did testify that the Sea Fever disappeared into the night as he backed down from the collision). Finally, according to the version of the accident accepted by the district court, the Sea Fever, in close quarters, passed directly across the John David's path, then turned around and was passing in front of her again when hit. In these circumstances it is at least surprising that Anderson never saw the Sea Fever. However, in the absence of Sea Fever's running lights, his failure to do so was not so mystifying that we can simply say that he ought to have seen the other boat and impose liability for presumed negligence. *Cf. Mystic S.S. Corp. v. M/S Antonio Ferraz,* 498 F.2d 538, 541

(2d Cir. 1974) (negligent lookout presumed where defendant failed to notice tug and barge despite eight-mile visibility, repeated blasts of the horn, and shining of light on the barge). And in any case it remains entirely speculative whether seeing the erratic and misplaced Sea Fever would have enabled Anderson to have avoided the accident.

Appellant's second claim is that the John David was at fault in failing to sound a danger signal. A danger signal of five short blasts of the whistle is mandated by the International Rules when "vessels in sight of one another are approaching each other" and one "is in doubt whether sufficient action is being taken by the other to avoid collision." Rule 34(d). Otherwise, sound or light signals are allowed but not required "[i]f necessary to attract the attention of the other vessel." Rule 36. Appellant claims that Rule 34(d) was violated as a matter of law—the John David having been alerted by its radar to the risk of a collision and the night being clear. This being so, appellant argues, the John David was guilty of a plain statutory fault. *See, e.g., Bucolo, Inc. v. S/V Jaguar,* 428 F.2d 394 (1st Cir. 1970). This argument overlooks the finding below that the Sea Fever was proceeding without lights, and Anderson's testimony that he could not locate the Sea Fever visually. In these circumstances, we cannot say that the Sea Fever was "in sight of" the John David, i.e., that it could be seen visually from the latter. Rule 3(k). No precedent for a Rule 34(d) violation has been called to our attention in which the alleged offender was unable, through no fault of its own, to see the other vessel. The consequences of a finding of statutory fault, even now that the divided damages rule has been abandoned, are very serious. *See The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). A leading treatise labels the Pennsylvania rule "a drastic and unusual presumption." G. Gilmore & C. Black, *The Law of Admiralty* 494 (2d ed. 1975). We are therefore not inclined to stretch the plain language of the statute to cover a situation outside its terms.

This leaves the question of whether the John David was negligent in not sounding a warning or shining a light even though not statutorily required to do so.[2] This is a close question. However, even if it were negligent, without aid from the presumption which flows from a finding of statutory fault we cannot say that the district court was bound to find that the failure to signal was a cause of the collision. *Cf. Delta Airlines, Inc. v. United States,* 561 F.2d 381, 396–97 (1st Cir. 1977). Where the fault is not statutory, the burden is on the ship asserting it to show that it was a cause of the collision. *Oriental Trading & Transport Co. v. Gulf Oil Corp.,* 173 F.2d 108, 110 (2d Cir.), *cert. denied,* 337 U.S. 919, 69 S.Ct. 1163, 93 L.Ed. 1728 (1949). Here the John David was well lit, and Sea Fever's helmsman testified to having been aware of her presence at all times. Appellant argues that a warning might conceivably have awakened the respective captains or jarred Whipple into some kind of avoiding action. But this is so much a matter of speculation on this record that we are unwilling to second guess the lower court.

Appellant's third argument is that Rule 17 required the John David to take avoiding action. The rule's basic principle is that the privileged vessel is to keep her course and speed. This the John David did. Such "vessel *may* however take action to avoid collision by her manoeuvre alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action." Rule

17(a)(ii) (emphasis added). This the John David did not do, if Anderson is to be believed.[3] However, because Anderson could not see the unlit Sea Fever, it was not "apparent" that the latter was not taking appropriate action. Moreover, as Anderson testified, where his craft was well lit and the other not visible, almost any maneuver would have been more dangerous than simply maintaining a steady course and speed to enable the other to avoid him. Rule 17 goes on to provide that when the give-way vessel can no longer avoid the collision itself, the privileged vessel "shall take such action as will best aid to avoid the collision." Rule 17(b). Here again we cannot require that Anderson have made a last-minute maneuver to avoid colliding with a boat he did not see.

The puzzle remains that this collision occurred at all. However, we are not convinced that the district court erred and reject appellant's arguments that the John David was at fault as a matter of law.

*Accordingly, the decision of the district court is affirmed.*

---

**2.** Appellant argues that the John David also violated Rule 36. Because that rule is permissive rather than mandatory, we could find a "violation" thereof only in the most extreme circumstances, if ever. *See Union Shipping & Trading Co. v. United States,* 127 F.2d 771, 773 (2d Cir. 1942) (L. Hand, J.) (construing predecessor to Rule 36, former Rule 12). Those circumstances do not exist here.

**3.** If in fact Anderson did make a last-minute port turn, we cannot say the district court was clearly wrong in determining that such a maneuver would fall within the protection of the *in extremis* doctrine. Other than to avoid imminent collision, it is hard to conceive of a rational reason for making such a turn. Where the privileged vessel abandons course at the

last minute to avoid a dangerous situation created by the give-way vessel, it will not be found at fault for the ensuing collision. *See Bucolo, Inc. v. S/V Jaguar,* 428 F.2d 394, 396 (1st Cir. 1970) (*in extremis* doctrine applies when party asserting it was free from fault until emergency arose). Appellant insists that the John David should have turned to starboard. However, if for example the John David turned to port before or just as the Sea Fever unexpectedly turned to starboard, its maneuver could have been justifiable. Moreover, we will not judge strictly the privileged vessel's *in extremis* avoiding action. *Pacific-Atlantic S.S. Co. v. United States,* 175 F.2d 632, 640 (4th Cir.), *cert. denied,* 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949).