**In the Matter of the Complaint of
CAMERON BOAT RENTALS,
INC., et al.**

**Civ. A. No. 85–2619–LC.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

April 8, 1988.

**578**

Clayton Davis, Woodley, Barnett, Williams, Fenet, Palmer & Pitre, Lake Charles, La., for complainants.

Greg Thompson, Provost, Umphrey, Swearingen & Eddins, Port Arthur, Tex., for the claimants Eugene A. Rollins, et al., John H. Gernentz, Jr., et al., and P.E. Pipes.

Steven C. Barkley, Evans, Moses & Barkley, Michael J. Lindsay, Beaumont, Tex., for Charles V. and Della M. Bird.

## OPINION

VERON, District Judge.

One foggy morning in the Gulf of Mexico, the GULF QUEEN, a wooden vessel chartered for pleasure fishing, was at her final anchor before returning to shore when a crew boat bore down on her out of the fog and sheared off her stern, sinking the vessel, leaving one passenger missing and presumed dead and injuring others. Several actions arose as a result of the allision. A number of individuals ("claimants") reside in the Eastern District of Texas and have filed maritime tort claims in the Beaumont Division thereof.[1] Subsequently, owners and charterers of the crew boat M/V ALAN McCALL ("complainants") instituted these proceedings on September 9, 1985 under the Limitation of Liability Act.[2] The customary monition and injunction have issued, and the Beaumont suits are in abeyance pending the result herein. This court's summary judgment denying limitation of liability was reversed on appeal[3], and the matter was tried to the court sitting in admiralty on January 28, 1988.

## I. FACTUAL BACKGROUND

At the operative time the M/V ALAN McCALL was time chartered to Transco Exploration Company under which agreement the owner, Cameron Boat Rentals, Inc., and N.F. McCall Crews, Inc., who employed the crew members, collectively agreed to provide vessels to Transco complete with equipment and crews. Both Cameron Boat Rentals, Inc. and N.F. McCall Crews, Inc. were owned by Norman F. McCall and his wife. McCall's port captain, James Bosarge (whose payroll employer was N.F. McCall, Inc.) performed

---

**1.** *Gernentz v. Cameron Boat Rentals, Inc.*, No. B–85–509–CA (E.D.Tex. filed March 20, 1985); *Bird v. Cameron Crewboats, Inc.*, No. B–85–974–CA (E.D.Tex. filed July 8, 1985). The cases have been consolidated.

**2.** 46 U.S.C.App. §§ 181–196.

**3.** *In the Matter of the Complaint of Cameron Boat Rentals, Inc. v. Rollins*, No. 86–4396, slip op. [819 F.2d 1140 (table) ] (Fifth Circuit 1987).

supervisory work for both companies, including hiring and firing of crews. Whatever was known to the principals or agents of one company was known to the principals and agents of the other insofar as this case is concerned. The time charter agreement refers to the McCall companies collectively as "Owner", and although there is no language clearly establishing N.F. McCall Crews, Inc. as a demise charterer, that corporation was in effect a demise charterer or part of a joint venture with the registered owner providing an equipped and manned vessel to Transco, and will for purposes of this opinion be deemed an "owner" entitled to seek limitation of liability under 46 U.S.C.App. §§ 183 and 186.

No evidence was presented at trial of negligence on the part of any of the other complainants. Not all were "owners" under the Limitation Act, and none, other than N.F. McCall Crews, Inc. and Cameron Boat Rentals, Inc., remain in the case.

The M/V ALAN McCALL is a 110 foot crew boat of approximately 100 tons. It is powered by four diesel engines at 2,040 combined horsepower and travels at full speed ahead at about eighteen knots. When all four engines are thrown into full reverse from full speed ahead, its stopping distance is a little over one eighth of a nautical mile. This maneuvering characteristic was not posted on board and was in fact unknown until experiments were conducted after the accident.

On the morning of March 9, 1985 the 50 foot wood hulled fishing vessel GULF QUEEN was anchored while passengers fished in the Gulf of Mexico. The location was 50 to 55 miles off the coast of Louisiana in West Cameron Block 151. Visibility that morning was impaired by fog that was intermittent or "patchy". The denser patches of fog reduced visibility to as low as 100 yards, while visibility increased intermittently to 500 yards at best, or one-fourth of a nautical mile.

The crew operating the ALAN McCALL at the time consisted of Captain Eugene Trahan, pilot, and Carl Fletcher, deck hand. A second crew was off duty and below deck sleeping. Captain Trahan had been proceeding on a regularly-travelled route from the Transco dock toward a particular drilling rig, but while en route was diverted via radio to go to a different rig to get a machinery part. This diversion involved travel over an area which was not set aside for vessel traffic.

Due to the fog conditions Captain Trahan assigned deck hand Fletcher to stand as lookout in the wheelhouse, and moved his radar down from twelve mile range alternating between the three and six mile ranges. He did not sound fog signals (neither did the GULF QUEEN) nor did he reduce his speed, but continued at full speed ahead or eighteen knots. Captain Trahan believed at the time, erroneously, that radar would detect a wooden vessel the size of the GULF QUEEN.

It was the policy of N.F. McCall Crews, Inc. to operate the ALAN McCALL with one captain and one deck hand on duty. It was also company policy for the deck hand on duty to go down to check the engine room. That morning Fletcher's checks of the engine room averaged one three-to-five minute absence from the wheelhouse per hour, although company policy was for more frequent checks. There was no policy established or communicated by the company regarding procedures where the deck hand who was expected to make engine room checks would be called upon for lookout duty during conditions of restricted visibility, such as stopping the vessel during engine room checks or calling on relief lookout from the off-duty crew. Consequently the vessel running "full out" in fog without fog signals also ran minus a lookout during engine room checks. Trahan's policy was simply to have Fletcher inform him each time he left the lookout post. Moments before the allision, however, Fletcher failed to communicate effectively that he was going below. Had Trahan known that Fletcher was below, he would not have slowed down. He would have looked up from the radar hood more frequently, alternating about four or five seconds between radar and window. At the time of the occurrence the radar was on the six mile range.

Captain Trahan first saw the GULF QUEEN upon looking up from the radar when she was a mere sixty to eighty yards away. He jumped up and grabbed the throttles of the two forward engines and pulled them back. One engine died and the other went into reverse. He was unable to pull back the other two engines before impact.

Meanwhile Captain Jeptha Turner of the GULF QUEEN first noticed the ALAN McCALL on radar when the latter was two and three-quarters miles away. Although a bearings check revealed the vessel was headed into his vicinity at around twenty knots he did not take action at that time but continued to watch the radar. At one mile he heard the ALAN McCALL's engines, and as the vessel sounded large and did not turn away, he began to pull anchor. At one-quarter mile the ALAN McCALL broke fog and Captain Turner began to sound fog signals. The anchor was snagged on rocks and Captain Turner engaged the GULF QUEEN's engines in an attempt to run over the anchor and break the trip line. The trip line did not break. Now able to see the direction of the ALAN McCALL, Captain Turner placed the rudder hard left to swing her to port and out of the crew boat's path. Shortly before impact deck hand Ken Knowles cut the anchor line per Captain Turner's instructions. At about 11:30 A.M., the ALAN McCALL struck the port side of the GULF QUEEN at a forty-five degree angle, shearing off her stern eight feet forward of the transom.

Captain Eugene Trahan was twenty-three years old at the time and held a one hundred-ton ocean operator's license. He was not trained as a radar observer and had no radar endorsement on his license. His understanding was that radar would pick up almost any vessel. The sole training he had as a pilot was hands-on learning and observation of how the other pilots ran their boats. While he knew that company policy was to rely on pilot knowledge of and compliance with regulations rather than to give specific instructions, the way he conducted his vessel was in conformity with what he observed in the rest of the fleet. He ran his boat at full speed ahead in conditions of restricted visibility because that was how the other captains ran their boats. He knew of no captains who did otherwise, and understood it to be the standard industry practice. He had never heard a McCall boat sound fog signals, but had only heard fog signals from fixed platforms and large ships in channels. Again, he knew that the regulations were to do so, but had never been told by McCall or Bosarge to do so, and he did as the other McCall pilots did. He had been told specifically to have his deck hand regularly check the engine room while under way. He was not told to observe the regulation requiring a lookout during all times of restricted visibility.

Likewise, deck hand Carl Fletcher received only on-the-job training, as it were. He was hired from an application and his only conversation with port captain James Bosarge was when he was called to work. In his six month tenure before the accident, he had learned his job duties exclusively from the captains he served under. While on lookout duty during fog he did as directed whether it was to check the engine room or to get the captain a drink of water.

At the time of trial Norman F. McCall through his various companies was the largest crew boat operator in the Gulf of Mexico where he had been in the business for eighteen years. Prior to the accident neither he nor his port captain Bosarge took any affirmative steps to see that their pilots possessed minimum navigational skills or observed safety regulations. The company relied primarily on community reputation or references for hiring. Bosarge did not ask captains being hired if they operated at such a speed that the vessel could be stopped at one-half visibility. When he hired pilots without radar endorsements he did not mention that wooden vessels may not be detected by radar. There was no radar training, no training in the navigational "rules of the road" and no training in regard to operation in limited visibility. There were no safety meetings, safety memoranda or written examinations. Bosarge did not go

out with pilots "just to take a test ride." Operation manuals, cheap and plentiful, were not provided to the pilots. In short, the company relied entirely on the training received by a crew member from his previous captains in an informal and largely unsupervised apprenticeship system, and on the knowledge of regulations acquired in the licensing procedure. In Port Captain Bosarge's view this was the only system there was and he felt he could rely on it.

Bosarge did not know the full speed stopping distance of the M/V ALAN McCALL before the accident. Bosarge knew that it was dangerous and against regulations to go full speed ahead in fog without sounding fog signals. He also knew that it was the custom of eighty to ninety per cent of the industry in the Gulf to ignore these regulations. While Bosarge knew not to overspeed a stopping distance of one-half his visibility, he testified that he would keep going in fog if his deck hand went below and would act as his own lookout.

## II. SCOPE OF TRIAL

In pretrial memoranda the parties differed as to the appropriate scope of the trial. The complainants advocated a comprehensive trial in this court including all issues of punitive liability and of damages regardless of whether their liability was limited. The claimants advocated trial in this court only of issues essential to the limitation holding, *i.e.* deferral of punitive liability and of all damages issues to their chosen forum. This court responded by minute entry that all liability issues would be tried for reasons to be assigned in this

opinion and that the decision regarding trial of damages would be deferred until resolution of the liability issue and, if reached, the issue of privity or knowledge.[4]

■ It has long been said that the limitation court enjoys equitable discretion in choosing the course of action where litigation arising out of the same mishap is ongoing in another court. *E.g., Langnes v. Green,* 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931); *Ex Parte Green,* 286 U.S. 437, 438, 52 S.Ct. 602, 603, 76 L.Ed. 1212 (1932) ("sound" discretion); *Newton v. Shipman,* 718 F.2d 959, 961 (9th Cir.1983); *Helena Marine Service, Inc. v. Sioux City and New Orleans Barge Lines, Inc.,* 564 F.2d 15, 17 (8th Cir.1977), *cert. denied* 435 U.S. 1006, 98 S.Ct. 1875, 56 L.Ed.2d 387 (1978) ("broad" discretion). However, the Supreme Court has identified two related situations where failure to modify the injunction to permit the outside action to resume amounts to abuse of discretion: (1) where there is but a single claimant, *see Langnes v. Green, supra,* and (2) where multiple claimants are not in fact "competing" because the fund is adequate, *see Lake Tankers Corp. v. Henn,* 354 U.S. 147, 77 S.Ct. 1269, 1 L.Ed.2d 1246 (1957). Thirdly, it now appears settled that once limitation is denied it is up to the claimants rather than the court whether the proceedings will continue in place or the injunction will be dissolved to permit resumption of the other action. *See, e.g., Wheeler v. Marine Navigation Sulphur Carriers, Inc.,* 764 F.2d 1008, 1011 (4th Cir.1985); *Fecht v. Makowski,* 406 F.2d 721, 722–23 (5th Cir. 1969); *Pershing Auto Rentals, Inc. v. Gaffney,* 279 F.2d 546, 552 (5th Cir.1960).[5]

---

**4.** The minute entry of January 15, 1988 states, in pertinent part:
"The trial of this matter will encompass all liability issues, both compensatory and punitive. When the matter is taken under advisement after trial, the parties may submit, as part of their post-trial memoranda, additional briefing on the issue of whether the court can or should retain jurisdiction in the event limitation is denied. After advisement the court will rule on all issues and assign written reasons therefor, including:
(1) why all liability issues were tried
(2) whether or not liability should be limited, and

(3) if liability is not limited whether the Texas plaintiffs may resume litigation in their original forum."
"[A]ll liability issues" was understood to mean those pertaining to the M/V ALAN McCALL. Trial did not extend to the fault of the GULF QUEEN or to issues of comparative fault.

**5.** *But see, In re Sause Brothers Ocean Towing Co.,* 193 F.Supp. 14, 17–18 (D.Ore.1960) in which the limitation court retained jurisdiction, apparently against the claimants' wishes, for reasons of judicial economy. However, it is often stated that the purpose of the Limitation Act is not to prevent a multiplicity of suits but

When the time came to delineate the scope of trial herein there was no question of this being an adequate fund or single claimant case. Trial of liability and limitation issues as a preliminary matter appeared the most efficient course in light of the third rule above. The remaining considerations fall within an area where the court's discretion has not been curtailed. In concluding that trial of liability would include punitive liability issues this court considered that in the event limitation is denied any preclusive effect of these proceedings is for the second court to decide, and it may hold as necessary to preserve any jury rights the parties may have.[6] Also considered was the likelihood that the same witnesses would, to their inconvenience, be called upon to give the same testimony in another court or be recalled for additional testimony in this court if all liability issues were not tried at once.

## III. CAUSATION ANALYSIS

■ Any finding of fact herein which constitutes a conclusion of law is adopted as such and vice versa. Collision is a heavily regulated area and the fact finder must observe presumptions arising from the violation of navigational rules. Under the rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), a vessel's violation of a statute intended to prevent collisions gives rise to a rebuttable presumption that the violation was a cause of the collision. The vessel's burden then is to show that her fault in violating the statutory rule "could not have been ... one of the causes". 86 U.S. (19 Wall.) at 136. *See also, Insurance Co. of North America v. Board of Commissioners*, 733 F.2d 1161, 1165 (5th Cir.1984). Also, a presumption of fault amounting to a prima facie case of negligence operates against a moving vessel which strikes one at anchor. *United States v. T/B Arcadian 95*, 714 F.2d 470, 474 (5th Cir.1983); *Brown & Root Marine Operators, Inc. v. Zapata Off–Shore Co.* 377 F.2d 724, 726 (5th Cir.1967).

### (A) *Fog Signals*

■ The M/V ALAN McCALL was in violation of Rule 35(a), 33 U.S.C. foll. § 1602[7] which requires a motor vessel under way to sound fog signals at least once every two minutes. The evidence in this regard suggests the overall incompetence of Captain Trahan, especially the evidence that he never observed this rule. However even if the GULF QUEEN's violation of the similar rule for anchored vessels cancels the operation of the *Pennsylvania* rule for this issue, the court finds that this

---

to provide a concursus where warranted. *E.g., Pershing Auto Rentals, supra,* 279 F.2d at 550–51; *Ruiz v. Puerto Rico Sun Oil Co. Inc.,* 497 F.Supp. 298, 300 (D. Puerto Rico 1980). There is also the constitutional issue discussed in note 6 *infra.*

**6.** It is disputed whether the claimants have irrevocably waived jury rights in the Texas action. The Fifth Circuit implied in *Pershing Auto Rentals, supra,* that findings of the limitation court would be *res judicata* in a claimant's state court jury action permitted under the "saving to suitors" clause of 28 U.S.C. § 1333. *See,* 279 F.2d at 552. Where, as with the Gernertz claims, the saving clause action is on the law side of a federal court, the Seventh Amendment may well prevent *res judicata* impingement of any party's jury rights by the findings of the admiralty court. This was alluded to by the Advisory Committee on the 1966 rules amendments: "In cases (including some cases within the admiralty and maritime jurisdiction) in which the parties have a constitutional or statutory right of trial by jury, separation of issues may give rise to problems." Fed.R.Civ.Pro. 42(b) note (1966). Possible preclusive effect in another forum ranks with this court as a strong policy consideration in setting the order and scope of issues for trial. Underlying strenuous opposing efforts in cases of this nature to have a maximum number of issues tried in one forum or the other may be the misapprehension of each side that the other will enjoy "home town" evidentiary rulings and factual conclusions. The Limitation Act was fashioned by Congress as a shield rather than a sword and courts have repeatedly disapproved its offensive use. *See, e.g., Lake Tankers Corp. v. Henn, supra,* 354 U.S. at 152, 77 S.Ct. at 1272; *Fecht v. Makowski, supra,* 406 F.2d at 723. Therefore generally results should not obtain in either forum which would tempt an owner to invoke the Limitation Act solely for preclusive effect in a plaintiff's forum of choice.

**7.** Both vessels flew the American flag and were within the high seas of the United States, therefore the applicable statutory regulations are the International Regulations for Preventing Collisions at Sea, 1972 (a.k.a. 72 Collregs), which were given the force of law by the International Navigational Rules Act of 1977, 33 U.S.C. §§ 1601–02 and are appended thereto.

violation could not have been a cause of the allision. The GULF QUEEN's captain was aware of the presence of the ALAN McCALL on radar at two and three-quarters miles, therefore he was on notice the same as if he had heard fog signals.

### (B) *Speed*

Rule 6 requires "[e]very vessel [to] at all times proceed at a safe speed so that she can ... be stopped within a distance appropriate to the prevailing circumstances and conditions." Subsection (a)(iii) requires taking into account "manoeuvrability ... with special reference to stopping distance." The minimum stopping distance of a little over one-eighth of a nautical mile was unknown to Captain Trahan or his employers at the time so it could not have been taken into account.

Subsection (a)(i) requires taking into account "[t]he state of visibility." The half-distance rule is not directly applicable to these facts since the GULF QUEEN was stationary rather than oncoming, see *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1568 (11th Cir. 1985) (allision with bridge), however the rule of moderate speed remains, see *id.* In vessels with operational radar a moderate speed under prevailing conditions also requires consideration of "[t]he characteristics, efficiency and limitations of the radar equipment," Rule 6(b)(i), and "[t]he possibility that small vessels ... may not be detected by radar at an adequate range," Rule 6(b)(iv). It is clear that Captain Trahan did not appreciate the limitations of radar. Moreover, eighteen knots is not a moderate speed for the ALAN McCALL under the conditions prevailing at the time even if it were a moderate speed at one-fourth mile visibility, which is doubtful. Visibility for determining moderate speed in intermittent or patchy fog does not mean the greatest intermittent visibility.[8] Since

the ALAN McCALL was operating in violation of Rule 6 its owners bore the burden of showing that the violation could not have been a proximate cause of the allision. That burden is far from being met. The greater probability is that the accident would have been avoided if the ALAN McCALL had proceeded at a speed appropriate to the vessel's stopping distance, the limitations of radar and the one hundred-or-so-yard visibility of the fog banks from which the crew boat emerged a quarter mile from the GULF QUEEN. The ALAN McCALL's excessive speed was a contributing proximate cause of the allision.

### (C) *Lookout*

Collision Rule 5 Provides:

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

Rule 5, 33 U.S. foll. § 1602. It is abundantly clear, under facts already recited, that the ALAN McCALL violated this rule and that this violation was a major proximate cause of the accident. Fletcher, Captain Trahan's designated lookout, was not at his lookout post "at all times" as the rule requires. Fletcher's duties were impermissibly divided between the lookout and the engine room. Even if he had made Captain Trahan aware of his fateful absence, under the prevailing circumstances and conditions no degree of vigilance on Captain Trahan's part could have cured the violation because his duties would have been divided among the lookout, the radar and the wheel.[9]

### (D) *Radar*

Radar is not required on vessels such as the ALAN McCALL, but where present

---

8. *See, e.g., The Umbria*, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053 (1897) (speed too great for thicker areas of intermittent fog); *British Transportation Commission v. United States*, 230 F.2d 139, 140–41 (4th Cir.1956), *aff'd* 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957) (failure to reduce speed until emerging from fog one-fourth mile from other vessel was violation of moderate speed rule).

9. *St. Phillip Offshore Towing Co. v. Wisconsin Barge Lines*, 466 F.Supp. 403 (E.D.La.1979) concerned a tow in the Mississippi River where a captain was "attempting to navigate the vessel, to handle communications, to watch the radar and to serve as look-out." *Id.* at 410. This was held to be "clearly a violation of the rules." *Id.* Much of the authority that a lookout with divided duties, or that posting a lookout other than

and functional, radar must be used and used properly. Rule 7(b), 33 U.S.C. foll. § 1602. Although detection of nearby objects is better at the three-mile range than at the six-mile range, the fact that the ALAN McCALL's radar was set for six miles at the critical time does not constitute a violation since safety would require periodic checking of the more distant range while under way.

The court heard expert testimony that the standard industry practice is to hire pilots who have their radar endorsement. Such pilots would have understood the limitations of radar and therefore would have appreciated the importance of uninterrupted visual lookout in fog. Indeed, the most fundamental training would probably have instilled this appreciation in Captain Trahan. That, however, goes more to the competency of the pilot. Rule 7(b) addresses failure to use radar or to take fullest advantage of the information it yields. This is not to say that uninformed use of radar or overreliance thereon cannot be negligence or a proximate cause.[10] In this case it was both. It was also a violation of Rule 7(a) which requires the use of "all available means" for determining risk of collision.

### E. Conclusion—Causation

The claimants, having shown that negligence attributable to the M/V ALAN

"low and forward", *i.e.* on the vessel's bow, is a violation as a matter of law concerns larger vessels. *See, e.g., Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir.1977), *cert. denied* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978) (965-foot vessel); *Hercules Carriers v. Claimant State of·Florida, supra* (divided duty, 609–foot vessel with wheelhouse at rear). Where smaller vessels with limited crews have been concerned, some circuits have eschewed a *per se* rule in favor of a totality of circumstances test. *See, Capt'n Mark v. Sea Fever Corp.,* 692 F.2d 163, 166 (1st Cir.1982) (fishing vessel); *Anthony v. International Paper Co.,* 289 F.2d 574, 580 (4th Cir.1961) (tug); *see also, The Mamei,* 152 F.2d 924, 929 (3rd Cir.1945), *cert. denied,* 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611 (1946) (tow, clear weather). The evidence regarding the nature of the ALAN McCALL and of the fog in question establishes neither that the failure to post the lookout on the bow *did* contribute to the accident nor that it *could not have* contrib-

McCALL was a proximate cause of the accident, have established liability on the part of the vessel. Consequently the complainants are not entitled to exoneration from liability.

## IV. PRIVITY OR KNOWLEDGE

 Once negligence attributable to the vessel seeking limitation of liability has been shown to be a proximate cause of the loss, the owner seeking limitation of liability bears the burden of showing that it was without privity or knowledge of the negligent acts. *Complaint of Patton–Tully Transportation Co.,* 797 F.2d 206, 211 (5th Cir.1986); *Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 292, 87 L.Ed. 363 (1943). *See,* 46 U.S.C.App. § 183(a). A loss occurring due to the owner's failure to use due and proper care to provide a competent master and crew is within the owner's privity. *Verrett v. McDonough Marine Service,* 705 F.2d 1437, 1444 (5th Cir.1983); *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1155 (2nd Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

The negligence or knowledge of marine superintendent James Bosarge, who hired and oversaw the crews and operations, is chargeable to the owner. What he and Norman F. McCall knew and should have known, see *Patton–Tully, supra,* 797 F.2d

uted given the rest of the facts, which nevertheless amply support the conclusion that inadequate lookout was a proximate cause of the allision regardless of the test used and whether or not the *Pennsylvania* rule applies.

**10.** As one court well stated:
"[A] master who relies on radar alone and disregards any or all other precautions and requirements, statutory or otherwise, does so at his own risk.... Indeed, it is surprising how many collisions continue to occur despite the fact that both vessels are equipped with and are operating radar. We have already had occasion to comment on the fact that by giving a false sense of security radar, when not properly used may 'increase the chances of collision.'"
*Afran Transport Co. v. The Bergechief,* 274 F.2d 469, 472–73 (2d. Cir.1960) (citations omitted).

at 211 (objective standard), but did little or nothing about, has as much to do with this accident as the predictable conduct of the crew. The fact that navigational errors figured heavily in the accident does not negate privity or knowledge. Such errors are imputable to the owner where they are the natural consequence of the owner's unwritten policies. *See, Hercules Carriers, Inc. v. Claimant State of Florida, supra,* 768 F.2d 1558, 1575–76. The scofflaw *status quo* in the Gulf of Mexico, with which Bosarge was well familiar, plus the utter failure of the owner to educate its non-radar-certified pilots or to require compliance with regulations, worked a deadly combination. The complainants have failed to establish that they lacked privity with the negligent acts causing the allision.

## V. PUNITIVE LIABILITY

In *Complaint of Merry Shipping, Inc.,* 650 F.2d 622 (5th Cir.1981), the Fifth Circuit held that punitive damages are recoverable in actions under the general maritime law involving "willful and wanton misconduct, reflecting a reckless disregard for the safety of the crew." 650 F.2d at 626. That case involved unseaworthiness but its broader holding applies to all actions under the general maritime law including those of non-seamen. *See, Evich v. Morris,* 819 F.2d 256 (9th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987) (survivors' claims).

"Willful" is a state of mind surpassing in culpability ordinary negligence but less than intentional harm. Prosser & Keeton, *The Law of Torts,* § 34 at 212 (1984). "Willful" and "wanton" are roughly synonymous, at least in legal effect, with each other and with "reckless". *See id.*[11] "Wantonness" has been defined as "the doing of some act or omission to do some act with reckless indifference to the knowl-

edge that such act or omission will likely or probably result in injury." *Prosser & Keeton, supra,* § 34 at p. 34, n. 51.5 (supp. 1988) *quoting, Bishop v. Poore,* 475 So.2d 486, 487 (Ala.1985).

The conduct here in question, *i.e.* the hiring and use of pilots ignorant of radar fundamentals and who were expected to use radar and proceed in fog acting as their own lookouts or with lookouts having divided duty, when the owners knew that a great many Gulf vessels did not use fog signals, was in reckless disregard of the likely tragic result. Considering that the purpose of punitive damages is to deter the wrongful conduct in the same party and in others, see *Merry Shipping, supra,* 650 F.2d at 625, this court holds that the liability of Cameron Boat Rentals, Inc. and of N.F. McCall Crews, Inc. includes punitive liability, and that they should respond accordingly in an amount to be determined by the court deciding damages.

## VI. CONCLUSION

Whereas negligence attributable to the M/V ALAN McCALL was a proximate cause of its allision with the GULF QUEEN and such negligence was within the privity of its owners, the petition for limitation or exoneration of liability is denied. Accordingly the injunction previously issued by this court will be dissolved to permit the claimants to pursue their claims for damages, including punitive damages, which have been filed elsewhere.

IT IS SO ORDERED.

## JUDGMENT

For written reasons assigned this date,

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment denying limitation or exoneration of liability to com-

---

11. Compare the following jury instruction given in district courts of the Fifth Circuit:

"If you find for the Plaintiff, and if you further find that any Defendant did act with malice, willfullness or callous and reckless indifference to the rights of others, the law would allow you, in your discretion, to assess punitive damages against such Defendant as punishment and as a deterrent to others."

Committee on Pattern Jury Instructions, District Judges Association, Fifth Circuit, *Pattern Jury Instructions (Civil Cases),* damages instructions, part 8 (1980). It does not appear that the court's use of the conjunctive in *Merry Shipping, i.e.* "willful *and* wanton," 650 F.2d at 626 (emphasis added), implies two different states of mind both of which are required.

plainants Cameron Boat Rentals, Inc. and N.F. McCall Crews, Inc.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein on the issues of compensatory and punitive liability in favor of the claimants EUGENE A. ROLLINS, ET AL; JOHN H. GERNENTZ, JR., ET AL; P.E. PIPES; CHARLES V. BIRD and DELLA M. BIRD and against the complainants CAMERON BOAT RENTALS, INC. and N.F. McCALL CREWS, INC., subject to such comparative fault, if any, which may apply.

IT IS FURTHER ORDERED that the writ of injunction issued previously herein be dissolved.