USCA1 Opinion

 

 April 29, 1994 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1685 NORTH ATTLEBORO ARMS REALTY TRUST, Plaintiff, Appellant, v. HARTFORD FIRE INSURANCE COMPANY, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Torruella, Circuit Judge. _____________ ____________________ Guy E. Guarino for appellant. ______________ Raymond A. LaFazia with whom Gunning, LaFazia & Gnys, Inc. was on __________________ ______________________________ brief for appellee. ____________________ ____________________ BREYER, Chief Judge. The plaintiff in this case ____________ (the "Developer") is a real estate trust that hired a Contractor to build condominiums. The Developer says that a Subcontractor -- a maker of exterior walling systems -- defaulted on its contract to supply the condominiums with "curtain walls." And, it has sued that Subcontractor's surety, The Hartford Fire Insurance Company, for damages. The district court, trying both the facts and the law, found that the Developer suffered no harm -- at least, none that legally entitles it to an award of damages. The Developer now appeals, basically asking us to find that the court's factfinding was "clearly erroneous." Fed.R.Civ.P. 52(a). The district court's findings, however, have adequate record support; and, we therefore affirm its judgment. We have read the record in a light appropriately favorable to the winning party, defendant Surety. See ___ Capt'n Mark v. Sea Fever Corp., 692 F.2d 163, 166 (1st Cir. ___________ ______________ 1982). So read, the record reveals the following relevant background facts: 1) In a contract dated December 2, 1987, the Subcontractor promised the Contractor (which in turn was controlled by the Developer) to provide curtain walls for the condominium building for a total price of $339,655. 2) As of June or July, 1988, the Subcontractor had substantially completed the job. Several months later, on November 4, 1988, the Contractor's architect provided the Subcontractor with a "punch list" of five items to be corrected (such as "rust stains" on certain walls, "misalignment" of certain panels, "incomplete trim" around some sliding doors, etc.) About ten days later, the architect sent an expanded list of eight items. 3) On November 18, 1988, the Subcontractor wrote back that the work on the punch list "will cost approximately $3,000 to $4,000 to remedy." But, it would not perform that work until the architect released its final payment (which it estimated to be about $31,000). It pointed out that the architect retained an additional $34,000 (otherwise belonging to the Subcontractor) as security for performance; and, it agreed that the architect need not release this money until all the work was complete. In early December, the Developer wrote to the architect that the punch list work "ha[d] not been started," that it would require 24 of the units "to be plumbed out" (removing existing dry wall), and that this would cost $2,200 per condominium unit. A month later, the Developer wrote to the Surety that the Subcontractor was in "default." 4) Ten months later, in November 1989, the Developer's counsel wrote to the Surety stating that the Subcontractor's failure to cure the punch list defects meant that the Developer could not conclude closings of fifty-four (54) units which were under written purchase and sale agreements with third parties. -3- 3 He added that these "damages are not speculative," and that he would like to work with the Surety "in acquiring a settlement." Counsel wrote further letters, threatened legal action, and then, in preparing for litigation in September 1990, had the architect draw up a final repair cost estimate totalling roughly $345,000. After the Surety refused to pay, the Developer brought this diversity action, arguing, among other things, that the Surety broke its surety contract requiring it "promptly" to "remedy" any "default," and seeking damages in the amount of the repair and completion costs ($345,000). After a trial, the district court concluded that the Developer had failed to prove its case. The court said that although it accepted Developer's sole witness (the architect) as competent to testify on the matter of damages, it need not "credit" his opinion. Specifically, the court rejected the architect's $345,000 correction-cost estimate, which in the court's view was "an extraordinary amount," and which (by what seemed to the court "an extraordinary coincidence") amounted to the entire curtain wall contract price. The court found "more immediate" problems for the Developer in the fact that, even if one assumed that it would cost $345,000 to dismantle portions of the building and then make the punch list repairs, that cost would so vastly exceed "any resulting benefit" that it would "involve -4- 4 unreasonable economic waste." (internal quotation marks omitted). In such circumstances, the court concluded that the proper measure of damages was (1) the Developer's reasonably incurred actual costs, or (2) the loss of market __ value (e.g., the difference between the market value of the ____ structure-as-promised and the market value of the structure- as-constructed). See generally Concannon v. Galanti, 202 ___ _________ _________ _______ N.E.2d 236, 238 (Mass. 1964); Restatement (Second) of _________________________ Contracts 348(2) & cmt. c (1979); John D. Calamari & _________ Joseph M. Perillo, Contracts 14-29, at 633-36 (3d ed. _________ 1987). Because the record lacked any concrete evidence as to either, the plaintiff was not entitled to any recovery. On appeal, the Developer argues at length that the district court erred in its factfinding. But, on the all- important issue of loss suffered as a result of the Subcontractor's (alleged) default, the Developer's brief contains virtually no citations to the record. We have reviewed the record independently, but have found no significant evidence tending to show "lost unit sales" or sales "at reduced prices," or any other evidence of diminished market value. Indeed, the one person who would seem to have been qualified to testify about the market loss caused by the alleged defects in the walling system -- the -5- 5 Developer's trustee, Alfred Pace, Sr. -- did not testify. We, like the district court, can find no concrete evidence of loss, other than the evidence about the $345,000 in correction costs, which figure the district court found to be both (1) unbelievable and (2) an improper basis for recovery. We must respect the district court's decision to reject the architect's opinion. See Dedham Water Co., Inc. ___ ______________________ v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 457 (1st Cir. ____________________________ 1992). We also agree with the district court, for the reasons it stated, that the $345,000 is not a legally proper measure of damages. See Restatement (Second) of Contracts ___ _________________________________ 348(2) & cmt. c. Of course, we recognize that the Subcontractor itself conceded that it would cost roughly $3,000 to $4,000 as of November 1988 to complete the punch list items, and that, with minor exceptions, they were never completed. But, as far as we can tell, the Developer did not seek recovery for those costs, and the Developer does not argue for those specific costs on appeal. Thus, we need not consider in this context whose fault it actually was that the punch list corrections were never made. The district court also held that the Subcontractor's refusal to make the punch list repairs in November 1988 did not amount to a "default," for that -6- 6 failure represented a reasonable refusal not to proceed in the absence of a further payment, to which the Subcontractor was entitled. The record more than adequately supports this finding. And, in its light, we agree with the district court that there was not sufficient evidence of "rascality" by the Surety to support a chapter 93A claim. Levings v. _______ Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (Mass. 1979). _______________________ The finding of no proven damages is also sufficient to warrant judgment for the Surety on the Developer's remaining claims. The judgment of the district court is Affirmed. _________ -7- 7